*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DONALD BENNETT, et al.,

　　　　　　*Plaintiffs-Appellants,*

　　　*v.*

CITY OF EASTPOINTE, et al.,

　　　　　　*Defendants-Appellees.*

No. 03-2204

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-70036—John Corbett O'Meara, District Judge.

Argued: April 19, 2005

Decided and Filed: June 8, 2005

Before: MARTIN, COOK, and LAY, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** J. Mark Finnegan, HEBERLE & FINNEGAN, Ann Arbor, Michigan, for Appellants. Timothy S. Ferrand, CUMMINGS, McCLOREY, DAVIS & ACHO, Roseville, Michigan, for Appellees. **ON BRIEF:** J. Mark Finnegan, HEBERLE & FINNEGAN, Ann Arbor, Michigan, Michael J. Steinberg, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, Charles H. Chomet, KELMAN, LORIA, WILL, HARVEY & THOMPSON, Detroit, Michigan, for Appellants. Timothy S. Ferrand, CUMMINGS, McCLOREY, DAVIS & ACHO, Roseville, Michigan, Joseph Nimako, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, for Appellees.

---

## OPINION

---

BOYCE F. MARTIN, JR., Circuit Judge. In the present case, we again confront allegations that the City of Eastpointe and its police officers violated the Fourth and Fourteenth Amendment rights of young African-American bicycle riders. In this civil rights action brought pursuant to 42 U.S.C. § 1983, there were originally twenty-two plaintiffs and twelve separate incidents at issue. On June 20, 2003, the district court heard arguments, and eleven days later granted summary

---

[*] The Honorable Donald P. Lay, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

judgment in favor of the defendants on all counts. On appeal, twelve plaintiffs remain, seeking reversal on claims arising out of seven of the incidents.

Approximately five months after the district court's decision in this case, this Court issued an opinion in *King v. City of Eastpointe*, 86 Fed. Appx. 790, 2003 WL 22976567 (6th Cir. 2003) (unpublished), a case involving several claims, some with facts nearly identical to those at issue here. The district court had likewise granted summary judgment on all counts to the City of Eastpointe and its police officers. In *King*, this Court affirmed the district court's judgment with respect to all claims against the City of Eastpointe and the police supervisors, and also affirmed the grant of summary judgment in favor of most of the officers who played secondary roles in the alleged unconstitutional stops. The Court, however, reversed and remanded claims alleging Fourth and Fourteenth Amendment violations by defendant-Officer Childs following an April 1996 stop where the officer allegedly used a racial epithet, holding that this conduct raised an issue of fact as to whether the stop was based on race, and also whether the pat-down search conducted by Officer Childs was reasonable under the circumstances. The Court also reversed and remanded a claim alleging a Fourth Amendment violation by Officer Keiser during a vehicle stop in February 1997. Consistent with the holding in *King*, we AFFIRM in part and REVERSE in part, and REMAND for further proceedings.

## I.

Eastpointe, formerly East Detroit, is a suburb adjacent to Detroit. The 2000 census figures indicate that Eastpointe is 92.1 percent white and 4.7 percent African-American. Detroit was found to be 12.3 percent white and 81.6 percent African-American. Eight Mile Road, made famous by the popular movie *8 Mile* divides the two cities and is commonly known as a racial dividing line. The plaintiffs claim that they were subjected to racial discrimination when they crossed Eight Mile Road into Eastpointe. Against the backdrop of each individual Fourteenth Amendment claim is reference to the "DeWeese Memorandum." This memorandum was drafted by Eastpointe's current Chief of Police, Fred DeWeese, following a meeting he had with Charles King, Sr., the plaintiff and next friend to his minor-son-plaintiffs in *King*. In that memo, distributed only to the city manager, DeWeese wrote that when he was a Lieutenant, "[f]rom May of 1995 to August of 95 . . . . I was assigned as a Shift Commander on the Afternoon Shift . . . . My instructions to the officers were to investigate any black youths riding through our subdivisions . . . . I would expect that our officers would investigate younger black males riding bicycles."

## II.

The plaintiffs proceed under theories of individual, supervisory, and municipal liability under section 1983. At the summary judgment stage, the police officer-defendants' motions for summary judgment and all but one of their replies to the plaintiffs' motions for summary judgment focused exclusively on the Fourth Amendment claims. The district court, however, granted summary judgment sua sponte to the officers on all claims, including the Fourteenth Amendment claims. In addition to challenging summary judgment as to each specific incident, the plaintiffs argue that the district court abused its discretion in granting summary judgment sua sponte for the various individual defendants on the Fourteenth Amendment claims, and consequently, that we should reverse and remand all of the Fourteenth Amendment claims so that the plaintiffs have a proper opportunity to brief and respond to any motions for summary judgment. We begin by briefly explaining why we hold that the district court abused its discretion procedurally in sua sponte granting summary judgment on the Fourteenth Amendment claims against the police officer-defendants. We then provide some substantive guidance on the Fourteenth Amendment claims in our discussion of each individual incident.

A.

"When a district court grants summary judgment sua sponte, its decision is subject to two separate standards of review. The substance of the district court's decision is reviewed de novo under the normal standards for summary judgment. The district court's procedural decision to enter summary judgment sua sponte, however, is reviewed for abuse of discretion." *Shelby County Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 931 (6th Cir. 2000) (internal citations omitted). If we find no abuse of discretion in the district court's procedural decision, we review the decision substantively. If we find a procedural abuse of discretion, we reverse and remand to provide the district court the opportunity to review all of the evidence before making a substantive decision. *See id.*

A district court does not abuse its discretion in sua sponte granting summary judgment so long as "the losing party was on notice that it had to come forward with all of its evidence [and had a] reasonable opportunity to respond to all the issues to be considered by the court." *Id.* (internal quotation marks and citations omitted). As noted above, the police officer-defendants' motions for summary judgment and all but one of their replies to the plaintiffs' motions for summary judgment focused exclusively on the Fourth Amendment, though the officers concluded their reply briefs with the request that the district court dismiss "the claims of Plaintiffs." The district court concluded that the defendants were "seeking dismissal of the entire case" and then granted summary judgment in their favor.

We conclude that the district court abused its discretion in sua sponte granting summary judgment to the police officer-defendants on the Fourteenth Amendment claims. True, some of the defendants' briefs below, responding to the plaintiffs' motions for summary judgment, mentioned the Fourteenth Amendment. But nothing gave the plaintiffs any notice that they would be forced to defend against a nonexistent motion by the defendants for summary judgment on the Fourteenth Amendment claims. The officers could have moved for summary judgment on this issue in their own motion for summary judgment — but they did not. Thus, the plaintiffs were understandably "surprised by the proceedings" when the district court granted the officers summary judgment anyway. We therefore conclude that it was error for the district court to sua sponte grant summary judgment on the issue.

B.

With regard to the claims properly briefed below, this Court reviews a decision to grant summary judgment on the substantive claims *de novo. Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by "showing— that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted). In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, the facts and any inferences that can be drawn from those facts, must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The plaintiffs bring their claims for violations of their Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983. To succeed on a claim under section 1983, the claimant must demonstrate both that the conduct complained of was committed by a person acting under color of

state law and that the conduct deprived the claimant of rights, privileges or immunities secured by the Constitution or laws of the United States. *McKnight v. Rees*, 88 F.3d 417, 419 (6th Cir. 1996). The police and officials in this case were acting under color of state law and there is no dispute as to this factor. As in *King*, therefore, this dispute centers around whether the claimants suffered a violation of their constitutional rights. The plaintiffs here allege that numerous individual police officers violated their constitutional rights, that Police Chiefs DeWeese and Thomas Danbert are liable due to their supervisory role, and that the City of Eastpointe is liable for its policy of racial discrimination.

It is axiomatic that the Equal Protection Clause of the Fourteenth Amendment protects citizens from police action that is based on race. *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). The plaintiffs' claim here is one of selective enforcement, and therefore, they must establish that the challenged police action "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985). To show discriminatory effect, a plaintiff can proffer evidence showing similarly situated individuals of another race were treated differently through statistical evidence or identifying a person of another race who the police treated differently. *King*, 86 Fed. Appx. at 802 (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). To show discriminatory purpose, a plaintiff can proffer "evidence that an official chose to prosecute or engage in some other action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *King*, 86 Fed. Appx. at 802 (citing *Wayte*, 470 U.S. at 610) (internal quotation marks omitted).

### 1. Supervisory Liability Under § 1983

The plaintiffs seek to hold Chiefs DeWeese and Danbert liable based on their role in supervising the officers who allegedly committed constitutional violations. For a claimant to succeed on a claim of supervisory liability under § 1983, the claimant must show more than simply a supervisor's right to control employees, and cannot succeed solely on the theory of *respondeat superior*. *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.*

In *King*, this Court held with respect to one of the incidents there that "[w]ith the possible exception of DeWeese's memorandum, plaintiffs' evidence does not sufficiently show selective enforcement based on race. However, [even if the Memorandum were discriminatory] the plaintiffs cannot establish that Officer Childs was ever aware of the instructions given by DeWeese to the officers on his afternoon shift or that Officer Childs was aware of the Memorandum." *King*, 86 Fed. Appx. at 802. Thus, the Court declined to decide whether the DeWeese Memorandum was discriminatory, but held that even assuming the DeWeese Memorandum was discriminatory, "there is no evidence of a *causal connection* between those instructions and the investigatory stop conducted by Officer Childs on August 4, 1996." *Id.* at 803 (emphasis added).

Therefore, the *King* panel did not foreclose a finding of supervisory liability if the plaintiffs could provide sufficient evidence of the "causal connection" between DeWeese's instructions later memorialized in his Memorandum, and the activities of his officers — especially those who worked on the afternoon shift where he issued his instructions. We discuss, where appropriate, whether the plaintiffs' claims are sufficient to defeat a motion for summary judgment on supervisory liability within our discussion of each individual incident.

## 2. Municipal Liability Under § 1983

A municipality, like a supervisor, may not be held liable under section 1983, simply upon the theory of *respondeat superior*. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). A municipality may be held liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. Furthermore, for municipal liability, there must be an "affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). The claimant has the burden of proof for establishing the existence of an unconstitutional policy and demonstrating the link between the policy and the alleged injuries at issue. *King*, 86 Fed. Appx. at 801.

Here, the plaintiffs rely on the DeWeese Memorandum as the policy that wrought the constitutional violations upon them. For the plaintiffs to prevail, therefore, they must demonstrate that DeWeese had policymaking authority. The plaintiffs have failed, however, to account for the fact that at the time of the instructions, now-Chief of Police DeWeese was simply a lieutenant, and not a policy-making official. *See King*, 86 Fed. Appx. at 804 ("DeWeese was not Chief of Police during the time these earlier bike stops occurred, so his action or inaction could not result in ratification of a policy behind those incidents."). The plaintiffs argue that when DeWeese became Chief of Police, he did not rescind his earlier instructions, and therefore the Memorandum became city policy. We decline to adopt such a broad reading of the Memorandum without any evidence to support the assertion. The Memorandum, though arguably discriminatory, was only memorializing prior and limited instructions, made to four or five officers under his command on an afternoon shift. There is no evidence whatsoever, that after becoming Chief of Police, DeWeese renewed these instructions or that they motivated the conduct of the officers, who were not on the afternoon shift, years later. In sum, we hold that the DeWeese Memorandum did not constitute official city policy and therefore affirm the district court's grant of summary judgment in favor of the City of Eastpointe.

## 3. Qualified Immunity Defense

"A government official who performs discretionary functions is entitled to qualified immunity from civil suits for damages arising out of the performance of his official duties unless his alleged conduct violated clearly established constitutional rights of which a reasonable person would have known." *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995). In *Feathers v. Aey*, this Court wrote:

> Qualified immunity involves a three-step inquiry. First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

319 F.3d 843, 848 (6th Cir. 2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)). The claimant must prove all three requirements or the officials are entitled to qualified immunity. We address qualified immunity in the context of each of the individual claims.

## III.

### A.  Incident # 1, August 6, 1995

Incident # 1 occurred on August 6, 1995, and involved plaintiff Weaver, his friend, non-plaintiff Clark, and defendant-Officers Edward Lulko and Eric Keiser.  Incident # 1 consisted of two separate encounters.  The parties, as in each incident, proffer quite different versions of the events.  The plaintiffs assert that Weaver and Clark were on their way to the home of Clark's friend near the intersection of Nine Mile and Gratiot Roads, and intended to reclaim one of Clark's old bicycles, which the friend had borrowed.  Weaver asserts that he and Clark were peddling at a normal speed through a public parking lot when they were pulled over by the defendants.  The officers claim to have first observed two bicycle riders proceeding slowly through a residential street "from house to house . . . onto sidewalks . . . up driveway approaches . . . [and] looking into yards."  The officers claim to have found the behavior suggestive of either criminal activity or that the riders were lost.  The officers claim that they drove up alongside the riders, rolled down the window, and engaged in conversation.  The officers asked Weaver and Clark what they were doing, and the plaintiffs stated that they were en route to a friend's house to pick up Clark's other bike.  According to the defendants, Weaver provided his name, told the officers he was looking for a friend's home, and the contact was terminated.  Weaver and Clark then continued on their way, picked up the bike, and headed back to Detroit, pulling the second bike in tow.

Moments later, the officers received a citizen's call reporting "two suspicious African-American males riding bicycles and pulling a third bike."  Responding to the call, the officers stopped Weaver and Clark a second time.  This time, both of the officers exited the car and made Weaver and Clark put their hands on the car's hood while patting them down.  The officers then ordered Weaver and Clark to sit on the curb, flipped over the bikes to read the serial numbers, and explained that a lot of people were coming across Eight Mile Road to steal bikes.  The officers radioed the serial numbers into the LIEN system, a system wherein bike serial numbers are recorded and reports of stolen bikes are kept.  The officers were told that nobody had reported the bikes stolen, and the boys were released.

### 1.  § 1983 Racial Discrimination Claim

Plaintiff Weaver asserts that the investigation by defendant Officers Lulko and Keiser violated his Fourteenth Amendment right to be free from discrimination on the basis of race.  He asserts that the stop and investigation into his presence in Eastpointe was the result of an unconstitutional Eastpointe policy to stop all black youths riding bicycles in the Eastpointe.  Just as in *King*, for evidence of the alleged discriminatory policy, Weaver points to the Memorandum written by Chief DeWeese to the City Manager, which includes the statement of his instructions to the officers under his command to "investigate any black youths riding through our subdivisions."  Weaver also points to the other similar incidents described herein, as well as the incidents in *King*, allegedly demonstrating unconstitutional action taken pursuant to the DeWeese Memorandum.  Furthermore, Weaver points to the allegedly racially loaded statement made by the officers that a lot of people were coming across Eight Mile to steal bikes in Eastpointe.

We have already determined above that the district court's grant of summary judgment in favor of the City of Eastpointe on the Fourteenth Amendment claims was appropriate.  We have also held that the district court erred procedurally in granting summary judgment to the defendants on the Fourteenth Amendment claims against the officers.  We now discuss whether supervisory liability might attach to this incident rendering Chief DeWeese liable.

In *King*, the Court found no evidence of a causal connection between the DeWeese Memorandum and the actions of the officers, and thus rejected the plaintiffs' claims against

DeWeese on the theory of supervisory liability. The plaintiffs here however, have proffered evidence of a possible causal connection between the officers' conduct and the DeWeese Memorandum, because the allegedly unconstitutional conduct by Lulko and Keiser occurred on the afternoon shift in August 1995, during the time in which the Memorandum states that DeWeese instructed his officers to investigate any blacks youths riding through Eastpointe. Thus, because we are remanding the Equal Protection claims against the officers, we think it prudent to remand the claim against Chief DeWeese, in this incident, because the plaintiffs have put forth evidence of a causal connection such that it could fairly be said that DeWeese "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate," *Bellamy*, 729 F.2d at 421, such that supervisory liability would attach.

### 2. § 1983 Fourth Amendment Search and Seizure Claim

Weaver also alleges that the officers' investigation was an unreasonable search and seizure in violation of the Fourth Amendment. The parties dispute whether the first encounter was a "stop" within the ambit of the Fourth Amendment. A purely consensual encounter between a police officer and a citizen does not implicate the Fourth Amendment. It is only when an officer restrains an individual's liberty "by means of physical force or show of authority" that Fourth Amendment protections attach. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). A person's liberty is restrained if a reasonable person in the circumstances would not believe that she were free to leave and ignore the officer's requests. *See e.g.*, *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

The district court correctly concluded that the first encounter between the officers and the plaintiff was not a "stop" under the Fourth Amendment. Both parties describe what amounts to a consensual encounter where the police approached two individuals and asked them some questions. There is no indication in the record that the officers did anything to restrain the freedom of movement of the plaintiff. The defendants do not dispute that the second encounter was a stop within the Fourth Amendment. What the parties dispute, however, is whether there was reasonable suspicion for the stop and whether the subsequent investigatory methods used were reasonable under the circumstances.

Here, towing the third bike was a violation of Michigan State Law, *see* Mich. Comp. Laws § 257.661, which prohibits a rider from carrying anything that prevents him from keeping both hands on the handlebars. The officers, therefore, lawfully stopped and talked to Weaver and his friend. This disposes of the question as to whether the initiation of the second stop was justified.

Nonetheless, this Court must still inquire as to whether the subsequent detention and intrusion was reasonably related to the scope of the stop. *Terry v. Ohio*, 392 U.S. 1, 17-19 (1968); *United States v. Hardnett,* 804 F.2d 353, 356 (6th Cir. 1986) (asking "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances."). The facts here are troubling. During the first encounter, Weaver was asked what he was doing and where he was going and he told the officers that he was going to a friend's house to pick up Clark's bike. The officers, having no lingering suspicions after the first encounter, just a few minutes later saw Weaver towing the third bike — doing exactly what he told them he would be doing. This fact did not arouse the officers' suspicions, but they chose to stop the youths nonetheless, because of the dispatch call. Lulko stated at his deposition:

Q.      Was there suspicion for your [second] encounter [with Weaver] at 17:25?

A.      Was there suspicion?

Q.      Were they suspicious at 17:25?

A.      No.  I wouldn't – no.  The *only* reason we spoke to them [the second time] was because of the radio run.  It was suspicious to a citizen, but once we pulled it, it was the same guys.  And the story they told us [during the first stop] sort of coincided with what was going on [just before the second stop].

J.A. at 607 (emphasis added).  Nonetheless, the officers stopped Weaver and his friend, required them to dismount from their bikes, required them to place their hands on the front of patrol car, conducted pat-down searches of them, ordered them to sit on the curb, and called in the serial numbers on the bikes to determine if they were stolen.

Because of the observed violation of Michigan law, the officers were justified in stopping the plaintiff.[1]  *See Whren v. United States*, 517 U.S. 806, 810 (1996) (holding that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred" regardless of any subjective motivations).  Nonetheless, we hold that the facts as alleged by the plaintiffs constitute a Fourth Amendment violation based on the officers' conduct *after* the initial stop, and therefore reverse and remand the claim to the district court.

A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop, *see Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (driver) and *Maryland v. Wilson*, 519 U.S. 408 (1997) (passenger), and conducting pat-down searches "upon reasonable suspicion that they may be *armed* and *dangerous*." *Knowles v. Iowa*, 525 U.S. 113, 118 (1998) (emphasis added) (citing *Terry*, 392 U.S. 1).  A lawful stop does not necessarily carry with it the authority to conduct a pat-down search. *Terry*, 392 U.S. at 27 ("Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual . . .").  To justify a pat-down search, the officers must articulate specific facts that would warrant "a reasonably prudent man in the circumstances . . . . in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

The officers' justification for the search consists of only this statement in their appellate filing: "They patted down Weaver for their safety during the encounter.  The pat-down search to preserve the status quo was appropriate, given the nature of the investigation, the potential for harm to the officers investigating at close range, and the criminal act [towing the third bike] committed in the officer's presence . . ." Appellees' Brief at 46.  Despite this proffered justification, neither the Supreme Court nor this Court has ever justified a pat-down search simply to "preserve the status quo" or because officers were "investigating at close range."  The officers point to no facts whatsoever to support any concern for their safety.  In fact, in deposition, the officers specifically disclaimed any and all suspicion.  Thus, viewing the evidence in the light most favorable to the plaintiff, the plaintiff has demonstrated a violation of the Fourth Amendment based on the unreasonableness of the pat-down search and the intrusion during the stop.  Therefore, we reverse the district court's grant of summary judgment in favor of Officers Lulko and Keiser and remand for further proceedings.

To the extent that plaintiffs might be alleging that Chiefs DeWeese and Danbert as well as the City of Eastpointe may be held liable for Officers Lulko's and Keiser's searches and seizures during the investigatory stop of August 6, 1995, summary judgment was proper.  The plaintiffs have introduced no evidence that Chiefs DeWeese or Danbert encouraged any Fourth Amendment-related misconduct on the part of Lulko and Keiser, *see Bellamy*, 729 F.2d at 421, nor is there any evidence

---

[1]While the stop was justified from a Fourth Amendment perspective due to the violation of state law, we note that the lack of suspicion admitted by Officer Lulko may properly be considered in the plaintiffs' selective-enforcement claim.

of an unconstitutional city policy pursuant to which Lulko and Keiser acted, *see Monell*, 436 U.S. at 694.

Defendant police officers assert that they are entitled to qualified immunity with respect to these claims. Officers Lulko's and Keiser's search of Weaver, viewing the facts in the light most favorable to Weaver, however, does not warrant qualified immunity, as it would constitute a search that is unreasonable under the Fourth Amendment and would be an objectively unreasonable search by a police officer that would not entitle the officer to qualified immunity. *See Terry*, 392 U.S. at 27.

## B. Incident # 3, August 28, 1995

Incident # 3 occurred on August 28, 1995, and involved plaintiffs Mitchell, Johnson, Simpson, and Posey, and defendant-Officers Murdock, Deal, and Magrita. The plaintiffs were riding bikes through the neighborhoods near their homes and, as they crossed Eight Mile Road into Eastpointe, Officer Murdock stopped them.

The evidence indicates that the Eastpointe police received an anonymous tip that four black males were riding two bicycles, a violation of Mich. Comp. Laws § 257.658, and were "acting suspicious." Murdock used his siren and overhead lights, pulled behind the youths, and stopped them for approximately ten minutes. During the stop, defendant-Officers Deal and Magrita arrived to provide back-up support. Murdock got out of his car, approached the youths, and ordered them off their bikes. The officers then separated the youths, searched them, and demanded personal identification. Mitchell alleges that Murdock took his bike without asking if he owned it, checked the serial number, and verified that the bike had not been reported stolen. Nonetheless, the officers confiscated the bikes, ordered the youths into the patrol car, and transported them back across Eight Mile road. The bikes were later sold at a police auction.

### 1. § 1983 Racial Discrimination Claim

For the reasons stated in part II A., *supra*, we reverse the district court's grant of summary judgment in favor of the defendant-officers.

### 2. § 1983 Fourth Amendment Search and Seizure Claim

#### i. Frisk of the Plaintiffs

The plaintiffs' claim under the Fourth Amendment in this incident is similar to their claim in Incident # 1. Here, the facts indicate that the officers received a call regarding four bicycle riders riding double, looking into garages, and acting suspicious. The officers observed the youths riding double, a violation of state law, and therefore lawfully stopped the plaintiffs. *See* Mich. Comp. Laws 257.658(1)-(2). Thus, the district court's grant of summary judgment in favor of the officers with regard to the initial lawfulness of the stop is affirmed.

The plaintiffs further allege, however, that the even if there was a proper basis for the initial stop, as we have held there was, the detention, frisk, and confiscation of the bikes was unreasonably intrusive and not reasonably related to the scope of the initial detention and therefore a violation of the Fourth Amendment. We agree that the frisk and seizure of the bikes was unreasonable, but the length of the detention was not, and therefore reverse the district court's grant of summary judgment in favor of the officers and remand for further proceedings consistent with this holding.

The facts, as alleged by the plaintiffs, make out a recoverable Fourth Amendment claim. During this stop, the officers conducted pat-down searches of the plaintiffs, and again, their only justification is a conclusory reference to "officer safety." The officers have not, however, alleged

any facts that would create a reasonable suspicion that the plaintiffs were armed and dangerous. Therefore, the pat-down searches violated the Fourth Amendment. *Terry*, 392 U.S. at 27. The mere fact that an officer has the *authority* to arrest an individual does not, and never has, automatically permitted the officer to conduct a pat-down search should he choose *not* to effectuate the arrest. *Knowles*, 525 U.S. at 117-19. For an officer to conduct a search incident to arrest, there must be an *actual arrest*. Otherwise, unless the officer points to specific facts that demonstrate reasonable suspicion that the individual is armed and dangerous, the Fourth Amendment tolerates no frisk. *Id.*

### ii. Seizure of the bikes

This incident also involves the seizure of the plaintiffs' bikes. One of the bikes appears to have been plaintiff Mitchell's birthday present from his father and the other bike appears to have been pieced together from spare parts by plaintiff Simpson. The officers allege that each of the youths disclaimed ownership of the bikes, but viewing the facts in the light most favorable to the plaintiffs, we cannot agree with the officers.

After stopping the plaintiffs, and because of their alleged suspicions, the officers called in the bike's serial numbers into the LIEN system and found that they had not been reported stolen. Nonetheless, the officers claim that conflicting explanations, coupled with the officers's knowledge of recent bike thefts from that area, provided "reasonable suspicion and probable cause" to seize the bikes.

The record does not support this claim when the facts are viewed in the light most favorable to the plaintiffs. For example, plaintiff Mitchell, whose birthday present was seized, testified at his deposition that he was scared and the officers did not speak directly to him, and therefore he never asserted ownership of his bike. The officers still confiscated all of the bikes, possibly gave the youths property tags for the bikes, and said the bikes could be picked up from the police station with proof of ownership or a statement from a parent or guardian regarding ownership.

This Court is limited to determining whether the facts, when viewed in the light most favorable to the plaintiffs, make out a recoverable Fourth Amendment claim — here they do, and therefore summary judgment was inappropriate. The facts, viewed in the light most favorable to the plaintiffs, would support a finding that the officers did not have probable cause to believe the bikes were stolen and therefore did not have probable cause to seize the bikes. After running the serial numbers through the LIEN system and learning that the bikes were not reported stolen, the officers would have to proffer some facts to demonstrate that they had probable cause to seize the bikes — facts sufficient to warrant a person of reasonable caution in the belief that a crime is being or has been committed. *See*, *e.g.*, *Carroll v. United States*, 267 U.S. 132, 161-62 (1925). The plaintiffs' deposition testimony indicates that one of the bikes was Mitchell's birthday present and the other was pieced together from spare parts. A check of the LIEN system did nothing to cast doubt on the youths' story, and provided no indication that the bikes were stolen. The officers' "hunch" that the stories were inconsistent or that the bikes looked too new, does not rise to the level of probable cause sufficient to effectuate a permanent seizure of personal property.

This does not end the inquiry. In general, seizures of property require probable cause. *United States v. Place*, 462 U.S. 696, 701 (1983). As with brief detentions of the person, i.e., *Terry* stops, however, the Supreme Court "has recognized that some *brief* detentions of personal effects may be permitted based upon reasonable suspicion falling short of probable cause, provided that such detentions are 'minimally intrusive.'" *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 543-44 (6th Cir. 2002) (emphasis added) (quoting *Place*, 462 U.S. at 706). This Court has explained that "'seizures of personal effects when based on anything less than probable cause' are permitted only to the extent that they satisfy the standards for reasonableness applicable to

'*Terry*-type investigative detentions.'" *Farm Labor*, 308 F.3d at 544 (quoting *United States v. Saperstein*, 723 F.2d 1221, 1231 (6th Cir. 1983)).

This *Terry*-like inquiry for determining whether a seizure based upon less than probable cause is constitutional involves two steps. "First, the Court must determine whether the detaining officer has a reasonable and articulable suspicion that the property he wishes to seize is connected with criminal activity," *id.* (quoting *Sanders*, 719 F.2d at 887), and "[s]econd, the scope of the seizure must be reasonable, both in duration and in intrusiveness," *id.* (citing *Place*, 462 U.S. at 709). As for the second prong, this Court has stated that to determine whether "there is reasonable suspicion, the Court must then ascertain whether the detention is reasonable, that is, (1) was it sufficiently limited in time, and (2) were the investigative means used the least intrusive means reasonably available." *Sanders*, 719 F.2d at 887 (internal quotation marks omitted).

We therefore engage in the *Farm Labor* analysis to determine whether the seizure, based on reasonable suspicion alone, was constitutional. Assuming the officers had reasonable suspicion to believe the bikes were stolen, even in light of the clean LIEN check, the inquiry also requires determining whether the seizure was sufficiently limited in time and whether the investigative means were the least intrusive. *Id.* In *Place*, the Supreme Court held that a ninety-minute detention of the defendant's luggage was unreasonable in duration. *Place*, 462 U.S. at 709. The Court noted that in determining whether a Fourth Amendment violation has occurred, it is necessary to balance the government interest in the temporary seizure against the individual's interest in avoiding the intrusion. *Id.* at 703. In *Place*, the governmental interest was in preventing the transportation of narcotics and the ninety-minute detention was to arrange for a dog sniff of the luggage. *Id.* The Court found that the government's interest was substantial, but despite the substantial government interest, the detention for ninety minutes was unreasonable without probable cause. *Id.* at 709. The Court noted that the constitutional violation was complete based on the unreasonable detention, but further exacerbated by the agent's failure to tell the defendant where they were taking the luggage, how long they would keep it, and how it would be returned to him. *Id.* at 710.

Furthermore, in *Farm Labor*, this Court found the seizure of the motorists' green cards for four days to be unreasonable and therefore unconstitutional. *Farm Labor*, 308 F.3d 544-48. The district court found and this Court agreed that only one day or less was needed for the officer to contact and receive verification from the INS as to the card's authenticity. *Id.* at 546-47. In looking to the permissible time limitation for a seizure based on less than probable cause, the Supreme Court has not adopted a per se time limitation, but rather has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

We see little, if any, investigative need for confiscating the bikes in this case. The defendants assert no investigative rationale for the seizure, though the district court stated that the bikes were confiscated "to do a more thorough investigation when [the officers] returned to the station." There is no indication, however, that the officers ever investigated further. Having already run the LIEN check and asserting no additional investigative rationale, it appears to us that the officers seized the bikes for no justifiable purpose. This is made even clearer by the fact that the officers told the youths that they could come claim the bikes at any time, presumably immediately, as long as they brought their parents along or provided some other proof of ownership. The fact that the officers were willing to immediately turn over the bikes to a parent or to the youths upon proof of ownership demonstrates no urgent or specific law-enforcement interest in seizing the bikes.

If the officers had taken the bikes, immediately gone to the station, and engaged in a more comprehensive investigation into the ownership of the bikes, and then, finding no indicia of criminal wrongdoing, returned the bikes to the youths, there might not be any constitutional violation. In *United States v. Sharpe*, the Supreme Court emphasized, as it had explained in *Place*, that "in

assessing the effect of the length of the detention, we take into account whether the police diligently pursued their investigation." 470 U.S. at 685 (quoting *Place*, 462 U.S. at 709). Thus, it is "appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant" or his property. *Sharpe*, 470 U.S. at 686. Moreover, "the *brevity of the invasion* of the individual's Fourth Amendment interests" is key in determining whether a seizure can be justified on reasonable suspicion. *Sharpe*, 470 U.S. at 685 (citations omitted and emphasis added). The brevity or length of the detention is a flexible concept and needs to be evaluated in light of the law enforcement needs "as well as the time reasonably needed to effectuate those purposes." *Id.* Here, the officers have provided no explanation of the law-enforcement needs, nor any indication of the time necessary to confiscate bikes to conduct a more detailed investigation.

Furthermore, the fact that the officers may have given the youths property claim tags does not cure the constitutional violation. In *Place*, the Court held that the ninety-minute detention was unreasonable and therefore unconstitutional, but that the violation itself was "exacerbated" by the failure of the officers "to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion." *Place*, 462 U.S. at 710. While the possible presence of property tags here may have prevented such exacerbation, the officers still made no provision for returning the bikes "if the investigation dispelled the suspicion." *Id.* The officers essentially reversed the onus under the Fourth Amendment and placed the burden on the youths to demonstrate that the bikes were not stolen, whereas the burden, under the Fourth Amendment, is on law enforcement to justify its intrusions. It is not up to individuals to demonstrate the absence of criminal activity; rather, it is up to law enforcement, if they have appropriate suspicions, to investigate and confirm or dispel those suspicions. Permanently keeping the bikes and selling them at auction based on meager reasonable suspicion here violates the Fourth Amendment. We therefore reverse and remand this claim against defendant-officers Murdock, Deal, and Magrita for further proceedings.

For the same reasons as in Incident # 1, we affirm the district court's grant of summary judgment in favor of Chiefs DeWeese and Danbert, as well as the City of Eastpointe to the extent the plaintiffs have alleged a Fourth Amendment claim against those parties.

Officers Murdock's, Deal's, and Magrita's searches of plaintiffs Mitchell, Johnson, Simpson, and Posey, and the seizure of the bikes, at least as the plaintiffs allege it took place, do not warrant qualified immunity, as it would constitute a search and seizure that is unreasonable under the Fourth Amendment and would be an objectively unreasonable search and seizure by a police officer that would not entitle the officer to qualified immunity. *See Terry*, 392 U.S. at 27; *Place*, 462 U.S. at 709; *Farm Labor*, 308 F.3d 544-48.

### C. Incident # 5, April 18, 1996

Incident # 5 occurred on April 18, 1996, involved plaintiff Wilson and his two friends, non-plaintiffs Johnson and Traylor, and defendant-Officer Lulko. The plaintiff alleges that he and his friends, all on their own bikes, were riding along the sidewalk at a normal pace, not doing tricks or interfering with traffic, but once they crossed Eight Mile Road, Officer Lulko pulled his patrol car into an intersection in front of the youths and blocked their path. Wilson alleges that Lulko then interrogated them about what they were doing and where they were headed, that Lulko patted Wilson down, and asked who owned the bikes and if they went to school around there.

Officer Lulko asserts that he observed three bike riders riding between parked vehicles, jumping the curb in front of businesses, and allegedly interfering with traffic in violation of state law. Because this allegedly observed activity raised safety and theft concerns, Lulko stopped the

youths.  According to Lulko, he never left his vehicle, which contradicts Wilson's claim that Lulko patted him down.  Lulko states the encounter lasted five minutes during which he explained the safety concerns and provided the youths with directions.

### 1.  § 1983 Racial Discrimination Claim

For the reasons stated in part II, A., *supra*, we reverse the district court's grant of summary judgment in favor of the defendant-officers.

### 2.  § 1983 Fourth Amendment Search and Seizure Claim

Viewing the facts in the light most favorable to the plaintiffs, we hold that a genuine issue of material fact exists on this claim and reverse the district court's grant of summary judgment. Wilson claims that they were riding lawfully down the sidewalk when they were abruptly stopped by Officer Lulko.  Officer Lulko claims to have observed the youths riding between parked cars and jumping curbs, and therefore violating state law prohibiting interference with traffic.  Officer Lulko's version provides him with a lawful reason to stop and question the youths. Wilson's version of events does not provide Officer Lulko with any cause to stop the youths.

At the outset, whether Officer Lulko effectuated a stop within the ambit of the Fourth Amendment is disputed.  Wilson claims that Officer Lulko pulled his car in front of them, blocked their path, got out, and searched them.  Officer Lulko claims to have stayed in his car, merely advised the youths not to interfere with traffic, and provided them with directions.  This dispute of fact is similar to the dispute in *King* over the February 28, 1997 incident.  In that incident, the police officer pulled over the plaintiffs' vehicle alleging that they were not wearing their seatbelts, had air fresheners hanging more than four inches from the top of the windshield, and had a cracked windshield.  *King*, 86 Fed. Appx. at 810.  The defendants in *King* simply asserted that traffic violations occurred and therefore the stop was justified.  The Court held that "[w]hat plaintiffs are contesting, however, is whether these traffic violations did in fact occur . . . . Defendant's reliance on contested issues of fact demonstrates that summary judgment was not appropriate . . ." *Id.* There, as here, a "genuine issue of fact [exists] as to whether the ensuing investigatory stop was based on reasonable suspicion." *Id.*

If Officer Lulko had blocked the plaintiff's path by a show of authority and the plaintiff submitted to that show of authority, a seizure within the Fourth Amendment did occur. *California v. Hodari D.*, 499 U.S. 621, 626 (1991).  Moreover, if Officer Lulko frisked Wilson, a search and seizure occurred.  The district court found that because Officer Lulko observed Wilson and his friends violate state law by interfering with traffic, "[h]e, therefore, could briefly pat him down (because he could have been arrested)."  As discussed above, the mere fact that someone *could* be arrested, does not justify a pat-down search if the officer chooses not to effectuate an arrest and has no reason to suspect that the individual may be armed and dangerous. *See generally Knowles*, 525 U.S. at 117-19.

In sum, there are genuine issues of material fact in dispute as to both whether Officer Lulko had reasonable suspicion to stop the plaintiffs and whether Officer Lulko frisked Wilson.  When viewing the facts in the light most favorable to Wilson, it is clear that summary judgment for the defendants was inappropriate.

For the same reasons as in Incidents # 1 and # 3, we affirm the district court's grant of summary judgment in favor of Chiefs DeWeese and Danbert, as well as the City of Eastpointe to the extent the plaintiffs have alleged a Fourth Amendment claim against those parties.

Officer Lulko asserts that he is entitled to qualified immunity for the Fourth Amendment claim.  The encounter, and search, however, at least as Wilson alleges it took place, does not warrant

qualified immunity, as it would constitute both a seizure, and then a search, that were unreasonable under the Fourth Amendment, and would be an objectively unreasonable search and seizure by a police officer not entitling that officer to qualified immunity. *See Terry*, 392 U.S. at 27.

### D.  Incident # 6, June 24, 1996

Incident # 6 occurred on June 24, 1996, and involved plaintiff Sanders and defendant-Officer Childs.  Sanders states that he was on his way home from a day at Metro Beach dressed in swim trunks and a t-shirt.  He had been riding his bike, which was purchased at a garage sale and salvaged through spare parts, but got tired and decided to walk.  Officer Childs approached Sanders from behind and turned on the car's siren.  Childs got out of the car and instructed Sanders to "come here."  Sanders submitted to the officer's demand, and the officer told Sanders to put the bike down and stand against a gate whereupon he conducted a pat-down search.  The officer then interrogated Sanders, asked whether the bike was his, whether it was stolen, where he got it, where he was coming from, where he was going, and what he was doing "over there" in Eastpointe.  After twenty minutes, the officer allowed Sanders to leave.

Officer Childs adds only that Sanders appeared "much too large" for the bicycle and he stopped Sanders to investigate whether the bicycle was stolen, and whether Sanders was in violation of curfew, or needed assistance.

#### 1.  § 1983 Racial Discrimination Claim

For the reasons stated in part II, A., *supra*, we reverse the district court's grant of summary judgment in favor of the defendant-officers on this issue.  Substantively, however, we note that Officer Childs was in the police academy during the time in which DeWeese issued his instructions to the afternoon shift and never worked on DeWeese's afternoon shift.  Thus, when afforded the proper opportunity to defend against the officers' motion for summary judgment, should they file one, the plaintiffs will have to submit sufficient evidence to overcome this fact in order to survive the summary judgment stage on this claim.

#### 2.  § 1983 Fourth Amendment Search and Seizure Claim

Sanders claims both that Officer Childs did not have reasonable suspicion to stop him and that even if reasonable suspicion justified the stop, Officer Childs acted unreasonably in searching him.  Sanders asserts that he was simply walking his bike home from a day at the beach and was unreasonably stopped and searched by Officer Childs.  The defendants point to the fact that it was 10:30 p.m., Sanders was walking in an area where a number of bikes had been stolen, and according to Officer Childs, Sanders appeared "much too large" for the bicycle to have been his own.

First, a stop did occur at the outset when Officer Childs turned on his patrol car lights in a show of authority and required Sanders to submit and stand up against a nearby gate.  *See Hodari D.*, 499 U.S. 626.  By no means is it clear that Officer Childs had reasonable suspicion to justify the stop.  Therefore, a genuine issue of material fact remains as to the reasonableness of the stop.  While officers can surely and appropriately take into account the fact that an area is a high crime area, that alone, does not justify effectuating a seizure. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (finding reasonable suspicion to exist when an individual engaged in unprovoked flight from officers patrolling a high crime area).  The only particularized suspicion of any wrongdoing here is the officer's belief that Sanders was "much too large" for his bike, and this subjective belief is an issue of fact that may depend upon a credibility determination within the province of the jury.

The defendants cite *Houston v. Clark County Sheriff Deputy John Does 1-5,* 174 F.3d 809 (6th Cir. 1999), for the proposition that an officer's perception based on visual observations, even

if later determined to be inaccurate, provides reasonable suspicion.  The defendants read *Houston* too broadly.  In that case, one of the officers

> observed and was assaulted in an uprising at Chuck's [bar], heard a sound that resembled gunfire, heard a voice exclaim, 'He's been shot,' observed a victim bleeding profusely from the head, noticed a passenger enter a car next to the victim, watched the same car speeding away from the bar's parking lot, and identified the vehicle as best he could under hurried and otherwise difficult circumstances. These 'specific and articulable facts,' along with rational inferences therefrom, linked the crime at Chuck's to the vehicle that Deputy Schutte identified,

though the officers ended up stopping the wrong car.  *Id.* at 813.  While as a general matter, police officers may rely on their own and other officers' *reasonable* perceptions, those perceptions, the inferences drawn therefrom, and their ensuing actions in response to those perceptions must ultimately be reasonable.  To say that Officer Childs's belief that Sanders was too large for his bike equates to the officers' reasonable perceptions in *Houston* is not automatic, and at the very least, generates a genuine issue of material fact as to whether reasonable suspicion existed for the stop.

Second, even if there were reasonable suspicion for the stop, Sanders argues that a genuine issue of material fact exists as to the reasonableness of the intrusion during the investigatory stop. Here, yet again, another officer with absolutely no articulated suspicion conducted a pat-down search — and in this case, Officer Childs required Sanders to stand against a gate while he was frisked.  To reiterate, "'[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is *armed and presently dangerous* to the officer or to others,' he may conduct a limited protective search for concealed weapons." *Adams v. Williams*, 407 U.S. 143, 146, (1972) (emphasis added) (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968)).  Officer Childs attempts to justify the pat-down search by the fact that it was night and the investigation was occurring at close range.  This is insufficient to justify a pat-down search, however, and the officer has not identified any reason at all for believing that Sanders was "armed and presently dangerous." *Id.*  Therefore, we reverse the district court's grant of summary judgment in favor of Officer Childs on Sanders's Fourth Amendment claim.

For the same reasons as in Incidents # 1, # 3, and # 5, we affirm the district court's grant of summary judgment in favor of Chiefs DeWeese and Danbert, as well as the City of Eastpointe, to the extent the plaintiffs have alleged a Fourth Amendment claim against those parties.

Officer Childs asserts that he is entitled to qualified immunity for the Fourth Amendment claim, but the seizure and search, at least as Sanders alleges they took place, do not warrant qualified immunity, as they would constitute both a search and seizure that were unreasonable under the Fourth Amendment, and would be an objectively unreasonable search and seizure by a police officer not entitling that officer to qualified immunity. *See Terry*, 392 U.S. at 27.

### E.  Incident # 8, April 29, 1997

Incident # 8 occurred on April 29, 1997, and involved plaintiff-brothers James and Jermaine Shaffer, non-plaintiffs McCree and Loker, and defendant-Officer Lulko.  The youths rode to Arbor Drugs to buy a carton of milk for the Shaffers' mother and were on their way back to the Shaffers' house, riding down Brock Street in Eastpointe, a few blocks from the Detroit border, when Officer Lulko turned his car in front of the youths and blocked their paths. Officer Lulko exited the car and ordered the boys to get off their bikes and put their hands on the car.  Three of them submitted, while James Shaffer did not stop and instead dismounted his bike and walked two blocks toward Eight Mile Road.  As he was about to cross back into Detroit, another Eastpointe officer pulled his patrol car in front of James, threw him against the car, handcuffed him, and forcibly detained him in the

patrol car. During this time, Lulko ordered the youths to place their hands on the hood of the police car and conducted pat-down searches of the other three youths and told them they should have receipts for their bikes when they come over "Eight Mile" into Eastpointe. Eventually, the boys were released, but as they walked back toward Eight Mile Road, the officers followed behind in the police car until they crossed back into Detroit.

Officer Lulko claims to have encountered four bicyclists riding double, which is in contrast to the youths' claims that they were all riding their own bikes, and would conflict with the fact that James got off of his own bike and continued toward Eight Mile disregarding Lulko's order to stop. The defendants also note that James admits to riding "four abreast" through side streets, which would be a violation of state-law.

### 1. § 1983 Racial Discrimination Claim

For the reasons stated in part II, A., *supra*, we reverse the district court's grant of summary judgment in favor of the defendant-officers. Moreover, in this instance, summary judgment was particularly inappropriate because of the alleged racial tones to the officers's conduct — specifically, Officer Lulko's statement that the youths should have receipts for their bike when coming into Eastpointe and the officers' conduct in driving their police cruisers behind the youths until they crossed over Eight Mile back into Detroit. These allegations at the very least raise a genuine issue of material fact as to whether the stop was more burdensome or intrusive than it otherwise would have been because of race. We hold that a genuine issue of material fact does exist as to whether race contributed to the stop and intrusions during the stop, and therefore reverse the grant of summary judgment in favor of Officer Lulko.

In *King*, a stop on April 4, 1996, was found to be justified by reasonable suspicion of truancy and/or suspicion that criminal activity might be afoot, but this Court held that a genuine issue of material fact existed as to whether the officer's use of the allegedly racially derogatory term "boy," though a "close" question, "raises an issue of fact as to whether Officer Childs actions . . . following the stop were based on race." *King*, 86 Fed. Appx. at 803.

In this case, the district court found that the use of the phrase "Eight Mile" and reference thereto, was "racially loaded" as Eight Mile is known by all to be a racial dividing line between Detroit, which is predominately African-American, and Eastpointe, which is predominately white. Viewing the facts and inferences in the light most favorable to the plaintiffs, the statement that the plaintiffs should have receipts for their bikes when coming across Eight Mile, and the fact they were followed, for no discernible purpose, back across Eight Mile, made summary judgment for the defendants particularly inappropriate in this incident.

### 2. § 1983 Fourth Amendment Search and Seizure Claim

While it may be disputed whether the youths were riding double or whether they were riding four abreast down the street, either version amounts to a violation of state law, *see* Mich. Comp. Laws §§ 257.658, 257.660, and therefore provides reasonable suspicion for the initial stop. Furthermore, James failed to obey a lawful order of a police officer, a violation of Eastpointe Ordinance § 658.03, and that justified stopping him. The parties do not dispute that a stop within the Fourth Amendment occurred. Because Officer Lulko had reasonable suspicion for the initial stop, the only remaining issue is whether his actions during the stop were justified. For the reasons discussed above in each of the other incidents, we reverse the district court's grant of summary

judgment in favor of the defendants with regard to Jermaine Shaffer.**2** The officers point to no facts that would justify a pat-down search of Jermaine.

For the same reasons as in Incidents # 1, # 3, # 5, and # 6, we affirm the district court's grant of summary judgment in favor of Chiefs DeWeese and Danbert, as well as the City of Eastpointe to the extent the plaintiffs have alleged a Fourth Amendment claim against those parties.

Officer Lulko asserts that he is entitled to qualified immunity for the Fourth Amendment claim, but the search, at least as Jermaine Shaffer alleges it took place, does not warrant qualified immunity, as it would constitute a search that was unreasonable under the Fourth Amendment, and would be an objectively unreasonable search by a police officer not entitling that officer to qualified immunity. *See Terry*, 392 U.S. at 27.

### F. Incident # 10, June 27, 1998

Incident # 10 occurred on June 27, 1998, and involved plaintiff Bush and his two friends, non-plaintiffs Thrasher and Ware, and defendant-Officer Magrita. All three youths allege that they were riding on separate bikes home from the Eastland Mall. While riding one block north of Eight Mile Road into Eastpointe, the youths were pulled over by Officer Magrita, who pulled behind them and flashed his overhead lights. The defendants allege that two of the youths were riding double. Magrita states that he observed the youths riding bikes behind closed businesses. After driving by and making eye contact with the youths, he continued on his way. Five minutes later he returned to see the youths still riding in the same place.

Bush alleged that Magrita asked whether the youths knew "anything about people coming across Eight Mile and stealing bikes on this side of Eight Mile." Bush also alleged that Magrita made a joke about a "monkey" and ordered the youths to get off their bikes and walk "back across Eight Mile," and waited to observe that they do so.

#### 1. § 1983 Racial Discrimination Claim

For the reasons stated in part II, A., *supra*, we reverse the district court's grant of summary judgment in favor of the defendant-officers.

#### 2. § 1983 Fourth Amendment Claim

It is not disputed that Bush and his friends were riding bikes and hanging out in an alley behind closed businesses. In essence, the facts are agreed upon, but the parties dispute whether a stop occurred at all. Both sides agree that the officer approached in his car and activated his flashing lights, but disagree as to whether this led to a Fourth Amendment encounter. Both sides support their position with *Galas v. McKee*, 801 F.2d 200 (6th Cir.1986), where we held that a high-speed traffic chase was not itself a seizure, because the pursued driver refused to stop, i.e., the driver did not submit to the officers' show of authority. The City argues that if a high-speed chase with sirens and lights does not qualify as a "stop," neither does mere usage of lights without a chase. Pursuant to this logic, however, no traffic stop would be a true "stop," absent some unusual show of force. Key in *Galas* is that the suspect *failed* to stop, *despite* a show of authority and therefore his liberty was not restrained. This rationale comports with *California v. Hodari D.*, 499 U.S. 621, 626 (1991), which held that a Fourth Amendment seizure occurs when there is (1) a show of authority, and (2) submission to a show of authority. In *Galas* and in *Hodari D.*, there was a show of authority, but because the suspect fled, no submission to that show of authority. Here, however, Officer

---

**2**We affirm the district court with regard to James's claims — he admits that he was not patted down, and his temporary detention was justified based on his flight from the officers.

Magrita activated his siren — a show of authority[3] — and Bush and his friends stopped riding their bikes and gave attention — submission to Magrita's show of authority. Thus, the Fourth Amendment applies to this encounter. While we conclude that a stop did occur, we also conclude that Magrita had reasonable suspicion for the stop, based on his observations of the youths' loitering in an alley behind closed businesses and apparently suspicious behavior.

Unlike all of the other incidents in this case, Bush does not allege that he was frisked. He claims, however, that the officer ordered him to walk his bicycle out of Eastpointe back to Detroit, and then "escorted" him there. His deposition testimony indicates that the officer watched him cross Eight Mile to ensure that he complied, but that he was not physically escorted into Detroit. Fourth Amendment jurisprudence suggests a person is seized not only when a reasonable person would not feel free to leave an encounter with police, but also when a reasonable person would not feel free to *remain* somewhere, by virtue of some official action. *See Florida v. Bostick*, 501 U.S. 429, 439 (1991) (whether seizure occurred depends upon whether a reasonable person would believe he was "not free to decline the officers' requests or otherwise terminate the encounter"); *Evans v. Ball*, 168 F.3d 856, 861 (5th Cir. 1999) (collecting cases holding that pre-trial restriction on interstate travel is a seizure); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177-78 (7th Cir. 1994) (denial of freedom to remain in a place can be a seizure); *Beverlin v. Grimm*, 1995 U.S. Dist. LEXIS 11145, *8 n.1 (N.D. Ill. Aug. 4, 1995) ("[W]e think the Terry rationale is applicable to unlawful interference with freedom of movement, whether it be exerted by preventing a person from leaving or forcing her to leave."). We conclude that Bush's allegations, viewed in the light most favorable to him, establish an unreasonable seizure in violation of the Fourth Amendment by virtue of his being ordered back across Eight Mile.

For the same reasons as in Incidents # 1, # 3, # 5, # 6, and # 8, we affirm the district court's grant of summary judgment in favor of Chiefs DeWeese and Danbert, as well as the City of Eastpointe to the extent the plaintiffs have alleged a Fourth Amendment claim against those parties.

Officer Magrita asserts that he is entitled to qualified immunity for the Fourth Amendment claim, but the seizure, at least as Bush alleges it took place, does not warrant qualified immunity, as it would constitute a seizure that was unreasonable under the Fourth Amendment, and would be an objectively unreasonable seizure by a police officer not entitling that officer to qualified immunity. *See Terry*, 392 U.S. at 27.

G. Incident # 11, August 3, 1998

Incident # 11 occurred on August 3, 1998, and involved plaintiffs Phillips and McQueen, their friends, non-plaintiffs Riser, Elliot, and Graham, and defendant-Officers Diegel and Borowsky. The youths claim that they were riding bicycles to an Eastpointe bicycle shop with the intention of purchasing new bikes with money from McQueen's and Phillips's mothers. They rode on four bicycles with one of the bikes occupied by two of the youths. After leaving the bike shop without purchasing any new bikes, the youths stopped and bought candy at an Amoco gas station convenience store. The officers state that off-duty police officer Patrick O'Connor observed the youths riding double and casing the front of a store. While near the store, one of the youths riding double approached some unattended bikes while the others hid behind a brick wall. When a car pulled into the lot, the youths changed their plans and walked away. O'Connor, who is not a party to the suit, believed the youths were "casing" the front of the store with the intent to abscond with unattended bicycles. O'Connor called the police department with his observations and then followed the youths in his car. Officer Diegel was dispatched and watched McQueen riding with

---

[3]We do not mean to imply that in all cases, the mere usage of a patrol car's siren constitutes a show of authority. In this case, however, viewing the facts in the light most favorable to plaintiffs, and looking at the totality of the circumstances, we believe that a show of authority occurred.

one other youth seated on the front handlebars and another standing on the rear foot pegs.  The plaintiffs claim that Officer Diegel swerved his patrol car "menacingly to cut [the plaintiffs] off and stop them."  Over the car's loudspeaker system, Diegel ordered the youths off their bikes and they complied.  Officer Diegel then "patted them down for officer safety" and called for back-up assistance.  Thereupon, two other patrol cars arrived.

Of the youths, Graham is white, and the others are African-American.  The plaintiffs allege that the defendants searched, temporarily handcuffed, and temporarily detained in the patrol cars only the African-American youths.  Graham was neither searched, handcuffed, or detained in the cruiser.

While in the back of the police car, Phillips claims to have thrown a gun wrapper out the window.  In response, one of the officers allegedly called Phillips a "nigger" and told him to "get your black ass out of that car and pick that piece of paper up, because you're not at home."  The youths were detained for twenty-five minutes, issued two citations, released, and told that they had "five minutes to get [y]our black ass[es] back across Eight Mile," and the officers followed them in their police cruisers to the city limits.

### 1.  § 1983 Racial Discrimination Claim

For the reasons stated in part II, A., *supra*, we reverse the district court's grant of summary judgment in favor of the defendant-officers.  Moreover, summary judgment was particularly inappropriate in this instance.  There is very clearly a genuine issue of material fact, as in Incident # 8, as to whether the stop was more burdensome or intrusive than it otherwise would have been because of race.

The officers do not dispute much of the allegations.  They note that one of the citations was issued to Graham, the white youth, for possession of tobacco by a minor.  Viewing the facts in the light most favorable to the plaintiffs, nonetheless, there is a genuine issue of material fact as to whether the officers' actions during the stop were based on race.  In *King*, this Court found the use of the term "boy," sufficient to create a genuine issue of material fact as to whether the officer's actions "following the stop were based on race," 86 Fed. Appx. at 803, and in our view, the allegations in this incident are much more egregious.

### 2.  § 1983 Fourth Amendment Search and Seizure Claim

The initial stop, we believe, was justified based on the officers' reasonable suspicion.  The question remains, however, whether the frisk, handcuffs, and detention in the police cruiser were reasonable under the Fourth Amendment.  As described in the previous incidents, the officers conducted pat-down searches of the youths they detained. In each instance, the asserted justification was "officer safety."  The defendants, however, have not pointed to one single fact which supports a concern for officer safety.  The officers do not even attempt to assert that they had any belief, let alone a reasonable one, that the youths were armed and dangerous.  Even if a *Terry* stop is justified at the outset, a frisk may take place only if the officer has a reasonable belief that the suspect may be armed and dangerous.  *Terry*, 392 U.S. at 27.  A reasonable belief that the suspect has contraband is not sufficient.  *United States v. Sibron*, 392 U.S. 41, 63-65 (1968).  A frisk is permissible if there is probable cause for the arrest, an arrest does in fact occur, and the frisk is incident to arrest.  *See Knowles*, 525 U.S. at 117-19.  The mere authority to arrest, however, without an actual arrest, does not justify a pat-down search in the absence of a reasonable belief that the suspect is armed and dangerous.  *Id.*  Once again, the officers in this incident did not conduct an arrest, and had no reasonable belief that the plaintiffs were armed and dangerous.  Therefore, summary judgment was inappropriate.

We next determine whether the plaintiffs' Fourth Amendment rights were violated when they were handcuffed and detained in the back of the police car during the *Terry* stop.[4] A *Terry* stop cannot be excessively intrusive and must be reasonably related in scope and duration to the purposes of the investigation. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). "When establishing that a detention, which was not supported by probable cause, was reasonable, the government must demonstrate that the detention and investigative methods used were reasonable under the circumstances." *United States v. Jacob*, 377 F.3d 573, 578 (6th Cir. 2004) (internal quotation marks and citations omitted). The "scope of the intrusion permitted" in the course of a *Terry* stop "will vary . . . with the particular facts and circumstances of each case," but in all cases the "detention must be temporary and last no longer than is necessary" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983)

"The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances." *Muehler v. Mena*, 125 S. Ct. 1465, 1472 (2005) (Kennedy, J., concurring) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). Consequently, this Court has held that "[d]uring a *Terry* stop, officers may draw their weapons or use handcuffs 'so long as circumstances warrant that precaution.'" *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir. 2005) (quoting *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir.1999)). To justify a pat-down search during a *Terry* stop the Fourth Amendment requires a reasonable belief that the suspect is armed and dangerous; likewise, for the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case. In *Radvansky*, this Court found that officers did not exceed the permissible bounds of a *Terry* stop when handcuffing a suspect after responding to a call that a burglary was in progress, it was late at night, and the suspect informed the officers he was armed with a stun-gun. *Radvansky*, 395 F.3d at 309. Likewise, in *United States v. Foster*, this Court found that an officer did not exceed the permissible bounds of a *Terry* stop when he handcuffed a suspect he reasonably believed to be under the influence of PCP, knowing that individuals under the influence of PCP can quickly become extremely violent. 376 F.3d 577, 587 (6th Cir. 2004). In *United States v. Hurst*, this Court stated that when a person "was reasonably suspected of having just burglarized a home and might reasonably have been deemed armed and dangerous," the use of handcuffs might be justified "as a precautionary measure for officer safety." 228 F.3d 751, 758 n. 3 (6th Cir. 2000). All of these cases adhere to the proposition we first clearly stated in *Houston v. Clark County*, *supra*, that the use of handcuffs during a *Terry* stop may be permissible so long as the circumstances warrant the restraint. *Houston*, 174 F.3d at 815. Other circuits have concluded the same. In *United States v. Bautista*, the Ninth Circuit stated that "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop," but the court did not preclude the possibility that circumstances would arise during a *Terry* stop that would permit handcuffing an individual. 684 F.2d 1286, 1289 (9th Cir. 1982). In fact, in *Bautista*, the court permitted handcuffing the suspect during this *Terry* stop because, in the words of the officer, "the suspects appeared extremely nervous and suspect Bautista kept pacing back and forth and looking, turning his head back and forth as if he was thinking about running." *Id.*; *see also United States v.*

---

[4] The issue of whether handcuffing and detention in the back of a police car violates an individual's rights often arises in two different contexts. In the first scenario, an individual argues that handcuffing and detention in the back of a police car constitutes an arrest, and unless there was probable cause, the individual's Fourth Amendment rights have been violated. That inquiry requires determining whether in fact the individual has been arrested, and if so, whether there was probable cause to support the arrest. The second scenario involves a *Terry* stop and the question is whether handcuffing or detention in the back of the police car was reasonable under the circumstances. While the plaintiffs were stopped, searched, handcuffed, and detained in the back of a police car, the parties have not addressed the issue in the context of an "arrest" and therefore we consider only whether, based on the facts in the light most favorable to the plaintiffs, the handcuffing and detention that occurred here was reasonable during and in relation to this *Terry* stop.

*Thompson*, 597 F.2d 187, 190 (9th Cir. 1979) (finding that handcuffing suspect during *Terry* stop was not unreasonable because the suspect "repeatedly attempted to reach for his inside coat pocket, despite the officers' repeated warnings not to."); *see also United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir.1993) (collecting cases to the same effect).

With this principle applied to the facts of this incident, we easily conclude that handcuffing the youths violated their Fourth Amendment rights. We previously concluded that the pat-down searches of the youths violated their Fourth Amendment rights because the officers had no reasonable belief that the youths were armed and dangerous. In any event, the officers did conduct pat-down searches, and uncovered no weapons or anything else to warrant further concern for their safety. That makes it truly remarkable (not in a good way) that the officers then handcuffed the youths. In addition to the fact that the officers had no reasonable belief that the youths were armed and dangerous, they have alleged no facts that would indicate that the youths attempted to flee or do anything else that would warrant this use of force. In sum, we see no circumstances here warranting the handcuffs as a precaution for officer safety or otherwise and therefore conclude that the use of handcuffs during this *Terry* stop violated the plaintiffs' Fourth Amendment rights.

We next consider whether the detention of the youths in the back of the police car violated their Fourth Amendment rights. We first note that no circuit has concluded that detention in the back of a police car automatically turns a *Terry* stop into an arrest — that is, while it is one of the factors to consider in determining whether an arrest has occurred, detention in the back of a police car is not per se an arrest. *See e.g.*, *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996); *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988); *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987); *United States v. Kapperman*, 764 F.2d 786, 790 n. 4 (11th Cir. 1985); *United States v. Manbeck*, 744 F.2d 360, 377-78 (4th Cir. 1984). That being said, determining that detention in the back of a police car is not an arrest does not resolve the question of whether the detention in the back of the police car was reasonably necessary based on the circumstances of the *Terry* stop. *See generally Florida v. Royer*, 460 U.S. at 500; *Jacob*, 377 F.3d at 578.

In the traffic stop context, courts have found some detentions in the back of police cars to be reasonable. In *Parr*, where the Ninth Circuit held that detention in the back of a police car is not per se an arrest, the court did not disapprove of the detention where in the process of pulling over the motorist, the officer observed the driver and passenger "bend towards the floorboard and 'make furtive movements,'" *Parr*, 843 F.2d at 1229, though the court did find that a warrantless search of the car based on those facts was not supported by probable cause. Likewise in *Thompson*, when the driver failed to produce identification, the court approved of a temporary detention in the back of the police car while the officer attempted to verify the suspect's identity. *Thompson*, 597 F.2d at 190. The Seventh Circuit's decision in *Rodriguez* also involved an attempt to establish a suspect's identity. *Rodriguez*, 831 F.2d at 166. The Fourth Circuit in *Manbeck* permitted detention in the back of a police car when the officers demonstrated that there was "no feasible alternative" and the defendant was neither "frisked or handcuffed." *Manbeck*, 744 F.2d at 377-78.

This Court confronted the issue of a detention in the back of a police car during a traffic stop in *Bradshaw*, 102 F.3d 204. After pulling over Bradshaw's vehicle for having an altered drive-out tag, Bradshaw got out of his car and approached the officer. *Id.* at 206. The officer testified that Bradshaw was acting "'nervous and jittery' and had actually begun to sweat." *Id.* At this point, the officer asked Bradshaw to sit in the back of the police car while he conducted an investigation of the altered drive-out tag, as well as Bradshaw's identification and vehicle certification. *Id.* On appeal, this Court noted that Bradshaw was detained in the police car "for 2 reasons: (1) Officer Kula was performing radio checks on him and issuing him a citation and (2) [Bradshaw's] 'nervous' and 'jittery' demeanor raised safety concerns for Officer Kula," and therefore concluded that the detention was not unreasonable under the circumstances. *Id.* at 212.

In a footnote, the Court asserted that "reasonable suspicion [need not] be present 'up front' for an officer to detain a motorist in his squad car while conduct a records search that is related to the traffic violation for which the motorist was stopped." *Id.* at 212 n. 18. The Court also concluded that the "initial detention of [Bradshaw] in the police car clearly did not exceed the scope of the traffic stop. Officer Kula could lawfully detain [Bradshaw] until he finished performing the radio checks and issuing the citation." *Id.* at 212. We read this language not to grant police officers carte blanche authority to throw any motorist pulled over for a traffic violation into the back of a squad car while they check the motorist's license and registration, but rather to stand only for the conclusion that the facts and circumstances in that case — the altered drive-out tag combined with Bradshaw exiting his car and approaching the officer in a nervous and jittery manner — "demonstrate[d] that the detention and investigative methods used were reasonable under the circumstances." *Jacobs*, 377 F.3d at 578.[5] Reading *Bradshaw* to create a bright line rule authorizing detention in the back of a police car for every traffic stop would run contrary to the body of this Court's and the Supreme Court's Fourth Amendment jurisprudence that the "scope of the intrusion permitted" in the course of a *Terry* stop "will vary . . . with the particular facts and circumstances of each case." *Royer*, 460 U.S. at 500; *see also Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) ("The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.") (internal quotation marks and citations omitted).

Moreover, were *Bradshaw* to allow officers to detain ordinary motorists in the back of a police car, it would create an ill-conceived spectrum of what is and is not permitted during a routine traffic stop — an officer would be able to order the driver out of the car and detain him in the back of the police car, but could still not frisk him.[6] *See Mimms*, 434 U.S. at 110 (holding that ordering a driver out of his or her car during a routine traffic stop is not inconsistent with the Fourth Amendment, and noting that Pennsylvania did not go so far as to argue that frisking a driver during a routine traffic stop would always be consistent with the Fourth Amendment). Finally, underlying *Mimms* and its progeny, is a concern for officer safety in the context of a traffic stop; that is, the concern that a driver, sitting in his car can make unobserved movements leading to an assault of the officer. *Id.* at 109-11. This concern, the Supreme Court has held, justifies allowing an officer to require a motorist to stand alongside his car instead of remaining seated inside of it — thus, a face-to-face confrontation diminishes the concern for an assault of the officer. *Id.* In this context — that is, the ordinary traffic stop — we see no additional justification that would warrant extending *Mimms* to permit officers to detain all motorists, or any individual in the course of a *Terry* stop, in the back of a police car, without circumstances that warrant the additional intrusion. While standing alongside one's car during a traffic stop is only a minor inconvenience and "not a serious intrusion on the sanctity of the person," *id.* at 111 (quotation marks omitted), we think that detention in the back of a police car involves the same, if not more "serious intrusion on the sanctity of the person, which may inflict great indignity, and arouse strong resentment, and it is not to be undertaken lightly." *Terry*, 392 U.S. at 17.

---

[5] *See also United States v. Wellman*, 185 F.3d 651 (6th Cir. 1999). In *Wellman*, this Court cited *Bradshaw* approvingly and as justification for an officer's detention of a motorist in the back of the police car during a traffic stop. Like Bradshaw, upon being pulled over, Wellman got out of his motor home and approached the officer's patrol car. "[Wellman]'s quick exit from his vehicle, instead of waiting for the officer to approach him, triggered in Officer Jones a suspicion that there may be some illegal activity such as drugs, weapons, a wanted person, or illegal immigrants hidden in the home." *Id.* at 653. Thus, the intrusion was reasonable under the circumstances — Wellman was not detained in the back of the police car during a routine traffic stop — but was rather detained because of his unusual and suspicious behavior upon being stopped.

[6] Allowing detention in the back of a police car during a routine stop, in our opinion, might actually put officers at greater risk of being assaulted. It is absolute that an officer may not frisk a motorist without reasonable suspicion that the individual is armed and dangerous. But, if an officer can automatically put any motorist in the back of the police car, but cannot frisk the individual, officers may be open to assault from behind by an individual concealing a weapon.

Turning to this case, we see no facts that warrant detention in the back of a police car. First, here the officers were not dealing with a nervous and jittery motorist who could step on the gas at any second and flee at high speeds, but rather the officers were approaching children on bicycles. Whatever can be said regarding officer safety during a traffic stop is less persuasive, we think, when an officer confronts a child riding on a bicycle. The youths made no movements consistent with flight and the officers do not assert that this was a concern. The youths answered the officers questions. There was no allegation that the youths failed to identify themselves. There was no indication the youths were armed and dangerous. Moreover, by the time the officers made the decision to detain the youths in the back of the police cars, they had already *searched* and *handcuffed* them. We fail to see how any concern for officer safety could have remained at this juncture.[7]

In this incident, of course, the officers did eventually issue citations to two of the youths — one for riding double, and one for underage possession of tobacco. On the facts of this case and for the reasons described above, nonetheless, we think that detention in the back of a police car solely for the purpose of writing the citations was also unreasonable. We write further only to note that the issuing of two citations is a weak justification for the detention of the four youths (in addition to the obvious problem with detaining only the African-American youths). This incident involved five youths riding on four bikes and therefore only one of the bikes was occupied by multiple youths. Thus, only one of the youths could have been cited for a violation the ordinance prohibiting riding double. Upon the unconstitutional searches, the officers discovered tobacco on one of the African-American youths, but it was immediately clarified that he was only holding it for Graham, the white youth. The officers detained in the back of the police cars, however, only the African-American youths, though they issued the citation to Graham. The detention in the police cars of the African-American youths for the purpose of issuing the citation to Graham is, therefore, a preposterous justification. Furthermore, the detention of all four African-American youths when only one of them could be cited for riding double renders the justification likewise unpersuasive. We therefore reverse the district court's grant of summary judgment in favor of the defendants on the frisks, handcuffing, and detention in the back of the police car, and remand for further proceedings.

For the same reasons as in Incidents # 1, # 3, # 5, # 6, # 8, and # 10, we affirm the district court's grant of summary judgment in favor of Chiefs DeWeese and Danbert, as well as the City of Eastpointe to the extent the plaintiffs have alleged a Fourth Amendment claim against those parties.

The officers here assert that they are entitled to qualified immunity on the plaintiffs' Fourth Amendment claims, but the search, handcuffing, and detention in the back of the police car, at least as the plaintiffs allege it took place, does not warrant qualified immunity, as it would be unreasonable under the Fourth Amendment, and would be an objectively unreasonable Fourth Amendment violation by a police officer not entitling that officer to qualified immunity.

\*   \*   \*

It goes without saying that we both recognize the risks and appreciate the sacrifices that law enforcement officers make on a daily basis. We are compelled to comment here, however, that we are both frustrated and concerned with what appears to be consistent disregard for basic Fourth Amendment principles by the Eastpointe Police Department and its officers, and an apparent misunderstanding by counsel as to the legal requirements for *Terry* stops. Counsel may shout "officer safety" until blue-in-the-face, but the Fourth Amendment does not tolerate, nor has the

---

[7]We also note that in the cases where courts have found detention in the back of a police car to be reasonable under the circumstances, the individuals were *not* also handcuffed.

Supreme Court or this Court ever condoned, pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that the person detained was armed and dangerous. The Supreme Court has, in interpreting the Fourth Amendment, struck a balance between the justifiable concern for officer safety when confronting an individual and the substantial individual interest in being free from unreasonable intrusion. The Framers' concerns and clear intent to protect individuals from arbitrary government intrusion was enshrined in the Fourth Amendment to prevent situations such as those alleged here — officers, having no reason to fear for their safety, may not require citizens, whom they have not arrested, to stand up against gates or place their hands on police cars, and submit to searches. This has long been the law.

## IV.

For the reasons given above, we AFFIRM the district court in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion. In particular, we REVERSE and REMAND for further proceedings all claims against the officers, including Chief DeWeese, based on the Equal Protection Clause because the district court erred procedurally in sua sponte granting summary judgment. Furthermore, we REVERSE and REMAND for further proceedings the following additional claims: Incident # 1: The Fourth Amendment claim for the allegedly excessive pat-down searches by Officers Lulko and Keiser; Incident # 3: The Fourth Amendment claim for the allegedly excessive pat-down searches by Officers Murdock, Deal, and Magrita, and the allegedly unconstitutional seizure of the bikes by the same officers; Incident # 5: The Fourth Amendment claim for the allegedly unconstitutional stop and unconstitutional pat-down searches by Officer Lulko; Incident # 6: The Fourth Amendment claim for the allegedly unconstitutional stop and unconstitutional pat-down search by Officer Childs; Incident # 8: The Fourth Amendment claim for the allegedly unconstitutional stop and pat-down searches by Officer Lulko with regard to Jermaine Shaffer; Incident # 10: The Fourth Amendment claim for the allegedly unconstitutional seizure of Bush; Incident # 11: The Fourth Amendment claims for the allegedly unconstitutional pat-down searches, handcuffing, and placement in the back of the police cruiser. On all other claims and with respect to all other defendants, we AFFIRM the district court's grant of summary judgment.