*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0439p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

--------

AUDI AG and VOLKSWAGEN OF AMERICA, INC.,
　　　　　　　　　*Plaintiffs-Appellees,*

　　　*v.*

BOB D'AMATO, d/b/a QUATTRO ENTHUSIASTS,
　　　　　　　　　*Defendant-Appellant.*

No. 05-2359

>

--------

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-70665—Paul D. Borman, District Judge.

Argued: October 24, 2006

Decided and Filed: November 27, 2006

Before: MARTIN and COOK, Circuit Judges; BERTELSMAN, District Judge.[*]

--------

## COUNSEL

**ARGUED:** Damian G. Wasserbauer, INTELLECTUAL PROPERTY ADVISORS, LLC, Canton, Connecticut, for Appellant. Gregory D. Phillips, HOWARD, PHILLIPS & ANDERSON, Salt Lake City, Utah, for Appellees. **ON BRIEF:** Damian G. Wasserbauer, INTELLECTUAL PROPERTY ADVISORS, LLC, Canton, Connecticut, for Appellant. Gregory D. Phillips, Cody W. Zumwalt, HOWARD, PHILLIPS & ANDERSON, Salt Lake City, Utah, for Appellees.

--------

## OPINION

--------

　　　BOYCE F. MARTIN, JR., Circuit Judge. Defendant Bob D'Amato, who is unaffiliated with Audi, used the domain name www.audisport.com to sell goods and merchandise displaying Audi's name and trademarks. Audi claims that D'Amato's website infringes and dilutes its world famous trademarks "AUDI," the "AUDI FOUR RING LOGO," and "QUATTRO," as well as the distinctive trade dress of Audi automobiles. Audi also claims that D'Amato violated the AntiCybersquatting Consumer Protection Act. The district court granted summary judgment and injunctive relief to Audi on all claims. The district court also granted Audi attorneys' fees, but refused to award Audi statutory damages under 15 U.S.C. § 1117(a). D'Amato appeals the grant of summary judgment and injunctive relief and award of attorneys' fees to Audi. He also appeals the district court's denial of

--------

　　　[*] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

his Rule 56(f) motion for additional discovery. For the reasons below, we **AFFIRM** the district court.

I

On February 11, 1999, Defendant Bob D'Amato registered the domain name www.audisport.com. He posted content to the website on June 4, 1999, and April 4, 2000. *Audi AG v. D'Amato*, 381 F. Supp. 2d 644, 654 (E.D. Mich. 2005). According to D'Amato, Richard Cylc, who worked at Champion Audi, an Audi dealership in Pompano, Florida, contacted him via email stating that he liked the site. Cylc later "asked if it would be mutually beneficial if we develop the site." Appellant's Br. at 4. Cylc then turned development over to Devin Carlson, a salesperson employed by Champion Audi, who D'Amato claims sent content to the site. *Id.* at 4-5. D'Amato testified that Carlson gave him verbal authorization to display Audi Trademarks. D'Amato alleges that when he asked if displaying the logos was permissible, Carlson stated that it had been authorized by a man named Bob Skal. *Audi*, 381 F. Supp. 2d at 649. D'Amato states that he asked Skal for written authorization "many, many, many times," but that Skal continued to make excuses as to why he had not gotten around to giving D'Amato written authorization. *Id.* at 649-50.

Audi has shown that in reality, Skal was not affiliated with Audi in any way.[1] *Id.* at 650. Further, Champion Audi, the employer of Carlson and Cylc, entered into an agreement with Audi providing that: "This agreement does not grant Dealer [Champion Audi] any license or permission to use Authorized Trademarks except as mentioned herein, and *Dealer has no right to grant any such permission or interest*." *Id.* (emphasis added).

Beginning on April 18, 2002, D'Amato agreed with Carlson that he would post hyperlinks to another site, www.audisportline.com, which would direct internet customers to an "Audisport Boutique and Services" webpage. This webpage offered goods (such as hats and shirts) with the "Audi Sport" logo, and an email subscription service offering "audisport.com" email addresses. *Id.* These items were posted for sale in 2003. *Id.* at 648. In exchange for posting the link on the website, D'Amato would receive a portion of the sales revenue. *Id.* at 650. Each item had a Paypal button for customers to make payments.

Prior to posting these items for sale, D'Amato commissioned Thompson Smith, a graphic designer, to create two logos incorporating the AUDI RING LOGO that D'Amato displayed on his audisport.com website. Smith visited the plaintiff's actual www.audi.com website and noticed some items of concern, which he emailed to D'Amato on May 21, 2002:

> 1. Audi already HAS a "Collection" site that is really well done with "some very limited" Audi Sport goodies. Are we taking over management, production of this and it will then become "audisport.com"?
> 2. Are you sure that we have the licensing rights to reproduce "Audi", "Audi Sport", quattro, etc. logos? If we do, lets please see this in writing for working with vendors, etc. I will need a copy of this.
> 3. Will the new company be incorporated, and we are employees/partners or are we going to be sub-contractors for [Audi of America]?
> 4. If incorporated or LLC as www.audisport.com, do we have a corporate lawyer?

*Audi*, 381 F. Supp. 2d at 648.

---

[1]Nor was Bob Skal affiliated with Champion Audi, according to a statement made by Devin Carlson.

While the www.audisport.com website was running, the homepage displayed the message: "Who are we? We are a cooperative with Audi of America, and will be providing the latest products for your Audi's [sic] and information on Audisport North America." *Id.* at 649. D'Amato initially testified that he never received written permission to display Audi Trademarks, but later stated that:

> Since the spring of 2003 to the present, I received email, oral, and written communications from Melissa Grunnah, Audi AG, currently Audi AG's Press Officer.[2] Devin Carlson initially directed me to Melissa Grunnah, who sends me news and press releases by e-mail about Audi racing events. She has on more than one occasion given me permission to post news, content, images and racing information at *audisport.com* as well as emailed to other multiple parties including *audiworld.com*. She sends copies of this content by email to multiple people, of which I am one of, on the email distribution list.

*Id.*

On May 29, 2003, due to the fact that the website had generated no profit, Carlson cancelled any further development. *Id.* at 650-51. He told D'Amato that he would tell him the actual date he should remove the links, though Carlson never got back to D'Amato about taking them down. On December 19, 2003, December 22, 2003, and January 8, 2004, D'Amato received Cease and Desist letters from Audi. *Id.* at 651.

D'Amato claims that on February 9, 2004, he "removed references to all approved page designs, all logos developed, and content posted having Audi Trademarks (AUDI, AUDI FOUR RINGS, and QUATTRO)" such that, as a result, "*audisport.com* appeared in a noncommercial way." D'Amato states that through the course of its existence, his "website was transformed from a non-commercial informational website, to a site for an Audi's [sic] licensee, and then back to non-commercial website," and contends that "Audi AG continues to use and supply content to *audisport.com*." Appellant's Br. at 9.

Despite D'Amato's contention, the facts show that www.audisport.com continued to have some commercial purpose. At the time the district court ruled on summary judgment, D'Amato was still offering to sell advertising space on the website. *Audi*, 381 F. Supp. 2d at 650. Simultaneously, the website informed visitors "this page is not associated with Audi AG or Audi USA in any way." *Id.*

II

The district court found that there were no issues of material fact and entered summary judgment in favor of Plaintiff Audi for its infringement, dilution, false designation of origin, and cyberpiracy claims. *Id.* at 670-71. The court denied Audi's request for statutory damages under 15 U.S.C. § 1117(a), but granted its request for a permanent injunction and attorneys' fees. *Id.*

The court also denied D'Amato's motion to reopen the discovery period through his submission of a Rule 56(f) affidavit. It found that although D'Amato was well aware of the issues with regard to which he sought discovery, he had not attempted to conduct discovery until after business hours on the last day of discovery. *Id.* at 653.

---

[2] According to Audi, Melissa Grunnah was not employed directly by Audi. Rather, she was an independent contractor who provided press relations services to Audi. *Audi*, 381 F. Supp. 2d at 663. The district court noted that Audi's contention is supported by the fact that her email address was "not an Audi company address (i.e. Grunnah@audi.com) but rather mgrunnah@charter.net." *Id.*

III

We review a district court's denial of additional time for discovery for abuse of discretion. *Plott v. General Motors Corp.*, 71 F.3d 1190, 1198 (6th Cir. 1995). Factors that should be considered include when the moving party learned of the issue that is the subject of discovery, how the discovery would affect the ruling below, the length of the discovery period, whether the moving party was dilatory, and whether the adverse party was responsive to prior discovery requests. *Id.* at 1196-97.

In this case, the discovery period ended on February 28, 2005. D'Amato sought additional discovery in the form of a notice of deposition faxed to Audi after business hours on this day, which Audi did not receive until the next day. *Audi*, 381 F. Supp. 2d at 653. The magistrate judge denied D'Amato's motion to compel responses and extend the discovery deadline, and the district court affirmed on June 17, 2005. *Id.* When it denied D'Amato's Rule 56(f) affidavit, the district court found that such an affidavit is appropriate when a party files it before discovery, but here, D'Amato filed it after discovery. *Id.* The court also noted that it had previously addressed and rejected this issue in June. *Id.*

D'Amato contends that his delay was excusable because he was unaware of the issue the request pertained to — namely, an alleged abandonment by Audi of its mark "AUDI SPORT" — until February 16, 2005. Appellant's Br. at 43-44. Even if we believe D'Amato, this was twelve days prior to the discovery deadline on which D'Amato finally made his discovery request. More importantly, D'Amato's counsel *conceded* at the magistrate hearing that D'Amato had been aware of the issue this request pertained to since December 14, 2004, a full two-and-a-half months before the discovery deadline.

In *Plott*, we found that the district court did not abuse its discretion in denying Plaintiff Plott's motion for additional discovery where he had learned of the pertinent issue three weeks before the close of discovery. *Plott*, 71 F.3d at 1197. Under this reasoning, we must find that a delay of two-and-a-half months is dilatory.

D'Amato has also failed to show that granting additional discovery time would have changed the outcome of this case. D'Amato contends that Audi abandoned its rights in the AUDI SPORT logo. However, as the district court noted, any dispute over D'Amato's use of the domain name www.audisport.com is immaterial to the question of whether he is liable for his use of the Audi Trademarks. *Audi*, 381 F. Supp. 2d at 649 n.1. Thus, even if D'Amato had used another domain name, such as www.damatoracing.com, he would still be liable for his commercial use of Audi's trademarks.

For the reasons above, we hold that the district court did not abuse its discretion when it rejected D'Amato's Rule 56(f) affidavit.

IV

A moving party is entitled to summary judgment as a matter of law "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" *Bennett v. Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). If the moving party meets its burden, the burden shifts to the nonmoving party to come forth with evidence demonstrating that there is a genuine issue of material fact, and therefore the case

should go to trial. Fed. R. Civ. P. 56(e); *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

We review *de novo* a district court's grant of summary judgment, construing the facts in the light most favorable to the nonmoving party. *Bennett*, 410 F.3d at 817.

### A. Trademark Infringement Claim

Under both common law and federal law, "a trademark is a designation used 'to identify and distinguish' the goods of a person." J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS, § 3.1 (4th ed. 2004) (quoting 15 U.S.C. § 1127). Under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, we use the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks. *Two Pesos v. Taco Cabana*, 505 U.S. 763, 780 (1992). D'Amato argues that the district court's finding of a likelihood of confusion should be reversed because Audi did not offer evidence demonstrating *actual* confusion. However, although proof that the buying public was actually deceived is necessary in order to recover *statutory damages* under the Lanham Act, only a "likelihood of confusion" must be shown in order to obtain *equitable relief*, which is at issue in this appeal. *Frisch's Restaurants v. Elby's Big Boy*, 670 F.2d 642, 647 (6th Cir. 1982).

We have held that in determining whether there is a likelihood of confusion, the following eight factors should be considered: (1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing of channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion in selecting the mark. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186-90 (6th Cir. 1988); *Elby's Big Boy*, 670 F.2d at 648.

As to the first factor, "[t]he strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore the more protection it is due." *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985). Audi's trademarks are world-famous, and D'Amato has provided no evidence to the contrary. The district court was correct in finding that "the Audi Trademarks are recognizable and widely known." *Audi*, 381 F. Supp. 2d at 660.

With respect to the second factor, relatedness of goods, we have held that "if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar." *Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 282 (6th Cir. 1997). The record shows that D'Amato sold merchandise bearing the Audi symbol on his website, in addition to selling @audisport.com email addresses and advertising space. The goods and services sold by Audi and D'Amato are "related," for they are "marketed and consumed such that buyers are likely to believe that the services [and goods], similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Id.* at 283.

As to the third factor, "[w]hen analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* D'Amato contends that his use of the domain name www.audisport.com is lawful because Audi cancelled the trademark "AUDI SPORT" in 1993. However, we have held that with respect to domain names, addition of characters along with the mark "does not eliminate the likelihood of confusion." *PACCAR Inc. v. Telescan Techs.*, 319 F.3d 243, 252 (6th Cir. 2003) (finding that Telescan's domain names, such as www.peterbiltnewtrucks.com, had the same appearance as PACCAR's domain name www.peterbilt.com). As in *PACCAR.*, where the addition of "generic or common descriptive words" did not make the domain names sufficiently dissimilar, in the case at bar, the addition of "sport" after "audi" fails to distinguish the two, and public confusion is thus likely. In addition, as the

district court found, the marks used by D'Amato on the goods and services sold are undoubtedly similar, for they are, in fact, Audi's *actual* trademarks.

In evaluating the fourth factor, evidence of actual confusion, we have noted that although such evidence is the best indicator of likelihood of confusion, "the absence of actual confusion evidence is inconsequential." *Id.* Here, the best evidence is Thompson Smith's email to D'Amato, *supra*, where he reveals his confusion with www.audisport.com. He notes that the real Audi website already has similar merchandise available. He further inquires about licensing rights and requests to have something in writing. If Smith, an experienced graphic designer, was confused by the relationship between Audi and D'Amato's business, then a consumer would be more likely to be confused.

With respect to the fifth factor, we consider "the similarities or differences between the predominant customers of the parties' respective goods or services," and "whether the marketing approaches employed by each party resemble each other." *Daddy's Junky Music Store*, 109 F.3d at 285. The same group of individuals — namely, those interested in purchasing goods and services displaying the Audi brand — would be the predominant customers to either Audi's or www.audisport.com's goods. In addition, both Audi and D'Amato used the internet in marketing. "[S]imultaneous use of the Internet as a marketing tool exacerbates the likelihood of confusion," given the fact that "entering a web site takes little effort — usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." *PACCAR*, 319 F.3d at 252 (citation omitted).

As to the sixth factor, degree of consumer care, given the fact that the goods and services offered on D'Amato's website displayed the Audi name and trademark, and the low cost of the items, consumers were unlikely to exercise a high degree of care when making purchases. "Internet users do not undergo a highly sophisticated analysis when searching for domain names." *Id.* at 253 (citation omitted). We also recognize that customers exercise a lower degree of care when services or goods for sale are inexpensive. *See Daddy's Junky Music Stores*, 109 F.3d at 285-86 ("For example, home buyers will display a high degree of care when selecting their real estate brokers, whereas consumers of fast-food are unlikely to employ much care during their purchases."). Here, the goods, shirts and hats, and services, such as email addresses, were relatively inexpensive and insignificant. Therefore, it is unlikely that a customer would exercise a great deal of care before making a purchase from D'Amato's website.

With respect to the seventh factor, we have noted that "[t]he intent of defendants in adopting [their mark] is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff], that fact alone may be sufficient to justify the inference that there is confusing similarity." *Elby's Big Boy*, 670 F.2d at 648. We have further explained that intent need not be proved by direct evidence of intentional copying. Intent may be inferred.

> First, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying. . . . Second, the nature of [the defendant]'s use of the marks on its web sites, such as including the marks in its domain names, repeating the marks in watermarks, and mimicking the distinctive scripts of the marks, indicates an intent to create the impression that the web sites are sponsored or affiliated with [the plaintiff].

*PACCAR*, 319 F.3d at 254.

Here, D'Amato used Audi's trademarks knowing that it appeared that he was intentionally copying the marks. In 1999, when he registered www.audisport.com, D'Amato was aware that Audi

used the trademarks AUDI, QUATTRO, and the AUDI FOUR RING LOGO. In fact, he emailed Volkswagen of America[3] asking if his registration of the domain name would cause any problems. However, the email bounced back to him, and D'Amato did not take any further action in order to determine whether there were problems using www.audisport.com. Further, Thompson Smith's inquiries regarding D'Amato's rights to use the Audi Trademarks should have put D'Amato on notice that there were issues with his website and the goods and services for sale. Also, although D'Amato received some form of permission from Devin Carlson and Bob Skal (neither of whom actually had authorization to grant such permission), D'Amato never recieved *written* permission. *Audi*, 381 F. Supp. 2d at 662.

D'Amato contends that Carlson and Melissa Grunnah gave him permission via emails that were legally binding. Appellant's Br. at 56-58. Even assuming *arguendo* that Carlson and Grunnah were authorized to give D'Amato permission to use the trademarks, in order to create a legally binding contract by electronic means, Michigan law requires that each party *agree* to conduct transactions electronically. MICH. COMP. LAWS § 450.835. There is no evidence in the record that Carlson or Grunnah agreed to create a legally binding contract via email authorizing D'Amato to use Audi's trademarks. Instead, it appears that the emails sent from Carlson and Grunnah to D'Amato simply included press releases regarding new Audi cars. These press releases were sent in the form of a mass email, and D'Amato was but one person on the distribution list. Audi has pointed out that nothing would have prevented D'Amato from posting these press releases on his own personal website. However, D'Amato went far beyond that. He somehow construed the phrase "Text and Photos Courtesy of Audi AG" contained in these Audi Press Releases to give him permission to run www.audisport.com in the manner he did. While we should construe all facts and inferences in favor of D'Amato on this summary judgment motion, D'Amato's argument that "Text and Photos Courtesy of Audi AG" somehow absolves him from liability for his commercial use of the Audi Trademarks is objectively unreasonable. We will not draw such unreasonable inferences. *See Willis v. Roche Biomedical Laboratories, Inc.*, 21 F.3d 1368, 1380 (5th Cir. 1994) ("This standard . . . does not allow, much less require, that we draw strained and *unreasonable* inferences in favor of the nonmovant.") (emphasis in original).

With respect to *PACCAR's* second factor in inferring a defendant's intent to derive benefit from a plaintiff's goodwill — namely, defendant's use of the marks — Audi also prevails. D'Amato used counterfeit (in other words, identical) Audi trademarks in the domain name and throughout the website such as in watermarks and wallpaper. *See PACCAR*, 319 F.3d at 254.

The last factor, likelihood of expansion of product lines, need not be analyzed because the product lines of Audi and www.audisport.com already overlap. *Id*.

In light of these factors, we agree with the district court's conclusion that there was a likelihood of confusion.

### 1. D'Amato's Defenses to Audi's Trademark Infringement Claim

D'Amato defends this claim on several grounds. As an initial matter, D'Amato raises the defense that Audi's claim is barred by the statute of limitations. However, the Lanham Act does not contain a statute of limitations. Rather, courts use the doctrine of laches to determine whether a suit should be barred. *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003).

Audi filed this suit on February 23, 2004. D'Amato contends that he first posted content to www.audisport.com on June 4, 1999. When deciding whether a suit is time-barred under the

---

[3] Volkswagen of America is a subsidiary of and the United States importer of cars manufactured by Volkswagen AG and Audi AG.

doctrine of laches, a court should consider "(1) whether the owner of the mark knew of the infringing use; (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable; and (3) whether the infringing user was unduly prejudiced by the owner's delay." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 (6th Cir. 2000) (citing *Brittingham v. Jenkins*, 914 F.2d 447 (4th Cir. 1990)). The district court judge correctly found that in this case, D'Amato has presented no evidence demonstrating that Audi "knew of his infringing use and inexcusably failed to challenge it." *Audi*, 381 F. Supp. 2d at 665. In his appeal, D'Amato has provided no additional evidence that Audi's delay was intentional or inexcusable. We also agree with the district court's conclusion that D'Amato was not unduly prejudiced because he was never actually authorized to use Audi's trademarks for a commercial purpose. *Id.*

D'Amato also defends on the ground that he had consent to use the trademarks. Even if Carlson, as a dealer, had permission to use Audi's trademarks, this agreement with Audi did not give Carlson the right to grant such permission to another party. Therefore, D'Amato did not have the right to profit from the goods Carlson provided. Further, as discussed above, nothing in the press releases sent to D'Amato appeared to confer consent to use Audi's trademarks for commercial gain. D'Amato's website also stated that he had a "signed agreement allowing usage of Audi-owned tradenames," even though no such agreement ever existed.

D'Amato contends that any proof of consumer confusion is rebutted by a disclaimer on his website which stated,"[t]his page is not associated with Audi GmbH or Audi USA in any way." First, such a disclaimer does not absolve D'Amato of liability for his unlawful use of marks identical to Audi's trademarks. *Ford Motor Co. v. Lloyd Design Corp.*, 184 F. Supp. 2d 665, 673-74 (E.D. Mich. 2002) ("The principle that disclaimers are often ineffective is especially applicable when the infringer uses an exact replica of the relevant trademark.") In addition, as we stated in *PACCAR*,

> [a]n infringing domain name has the potential to misdirect consumers as they search for web sites associated with the owner of a trademark. A disclaimer disavowing affiliation with the trademark owner read by a consumer after reaching the web site comes too late. This "initial interest confusion" is recognized as an infringement under the Lanham Act.

*PACCAR*, 319 F.3d at 253. Further, any effect this disclaimer had in reducing confusion would likely be negated by the statement on the website contending that there was a "signed agreement" with Audi.

D'Amato also defends his actions on the ground that his "[w]ebsite merely had hyperlinks to goods (hats and shirts) and email hosting services offered by Champion Audi," and that such "[h]yperlinks create no liability for [him]." Appellant's Br. at 50. However, even if D'Amato's intention was in fact non-commercial (which it does not appear to be), the issue is whether his actions had a commercial *effect*. We have stated that "the proper inquiry is not one of intent. . . . If consumers are confused by an infringing mark, the offender's motives are largely irrelevant." *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) (internal citations omitted). Even "minimal" advertisements constitute use of the owner's trademark in connection with the advertising of the goods, which the Lanham Act proscribes. *Id.* Further, the record shows that the URL for the Boutique and Services webpage was *www.audisport.com/Boutique.htm*, which would likely lead a customer to believe that the goods were part of D'Amato's website. In addition, entirely separate from the merchandise, www.audisport.com made advertising space available to sponsors. Thus, he was attempting to directly profit from Audi's good will.

D'Amato also asserts a defense of fair use, which means that he used the mark for a purpose other than that for which the mark is typically used. The Supreme Court has held that once a plaintiff shows a strong likelihood of confusion, the defendant may offer evidence rebutting the

plaintiff's evidence, or simply raise the fair use defense. The Court stated that "all the defendant needs to do is to leave the factfinder unpersuaded that the plaintiff has carried its own burden on that point." *KP Permanent Make-Up, Inc. v. Lasting Impression, Inc.*, 543 U.S. 111, 120 (2004). Even when we construe the facts in a light most favorable to D'Amato, Audi has shown that there is a clear likelihood of confusion based on D'Amato's use of the Audi Trademarks. D'Amato has presented no evidence to rebut this finding. All D'Amato mentions in his brief regarding his fair use defense is that he "submitted an affidavit that illustrated his 3 instances using the name Audi as a descriptive term for 'source of Audi Racing,' in disclaimers 'not associated with Audi AG,' in the news articles and to describe the pictures given to him." Appellant's Br. at 56. This information is irrelevant, and fails to address the many commercial uses of www.audisport.com. Thus, we find that under *KP Permanent Make-Up*, Audi has carried its burden to disprove fair use, and D'Amato's defense fails.

### B. Trademark Dilution

"Dilution law, unlike traditional trademark infringement law . . . is not based on a likelihood of confusion standard, but only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 801 (6th Cir. 2004) (quoting *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 628 (6th Cir. 2003)). We use a five-point test to determine whether a plaintiff will succeed in a federal dilution claim. Audi must show that its trademark is (1) famous and (2) distinctive, and that D'Amato's use of the mark (3) was in commerce, (4) began after Audi's mark became famous, and (5) "cause[d] dilution of the distinctive quality" of Audi's mark. *Id*. at 802.

It is clear from the record that Audi's trademarks, on which Audi has spent millions of dollars and which are known worldwide, satisfy the first two factors. Further, because the website sold merchandise, email subscriptions, and advertising space, all with Audi's logo, the third factor is satisfied. The fourth factor is met, as there is no dispute that www.audisport.com came after the Audi Trademarks. As for the fifth element — whether the junior mark dilutes the senior mark — the Supreme Court has noted that "direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proven through circumstantial evidence — the obvious case is one where the junior and senior marks are identical." *Moseley v. V. Secret Catalogue*, 537 U.S. 418, 434 (2003). Here, D'Amato used identical trademarks on the goods and services on his website, thus fulfilling the fifth factor. Moreover, it is of no moment that D'Amato did not profit from www.audisport.com; a plaintiff need not prove a defendant made sales or profited in order to succeed in proving dilution. *Id*. at 433.

### C. AntiCybersquatting Consumer Protection Act

The AntiCybersquatting Consumer Protection Act (ACPA) was enacted to curb "the proliferation of cybersquatting — the Internet version of a land grab." *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 808 (6th Cir. 2004) (quoting *Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 267 (4th Cir. 2001)). With respect to a famous mark, ACPA provides that a person will be civilly liable when he or she has a bad faith intent to profit from the mark, and "registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to or dilutive of that mark.." 15 U.S.C. § 1125(d)(1)(A).

In order to prevail under the ACPA, a plaintiff must show that a defendant's use of a domain name was done in bad faith. ACPA provides a list of nine nonexclusive factors which a court should consider in determining whether a defendant acted in bad faith:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of [subsec. (c)(1) of this section].

15 U.S.C. § 1125(d)(1)(B)(i). *See also Daimler Chrysler v. Net Inc.*, 388 F.3d 201, 206-07 (6th Cir. 2004). However, the Act has a "safe harbor" provision that applies where a court finds that a defendant "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

Audi accepts the district court's finding that Factors VI through VIII are irrelevant. As for Factors I and II, the district court was correct in finding that D'Amato has no trademark or intellectual property rights in www.audisport.com and the domain name consisted of Audi's legal name, which was used to identify Audi. With respect to Factor III, although D'Amato also used the website for *some* legitimate purpose — providing news to Audi fans — he did not have prior use of the domain name for the bona fide offering of goods or services. Those goods and services offered on the site infringed upon Audi's trademarks from the moment of their initial posting. Under Factor IV, we find that there was not fair use of the mark because D'Amato used www.audisport.com to sell merchandise and email addresses bearing the Audi name, and up until the district court issued the injunction, was selling advertising space bearing the Audi name.

Factor V concerns the defendant's intent. "As intent is rarely discernible directly, it must typically be inferred from pertinent facts and circumstances." *International Bancorp, L.L.C. v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco*, 192 F. Supp. 2d 467, 486 (E.D. Va. 2002). Here, D'Amato's website purposefully included Audi's trademarks in his website and affirmatively misrepresented his relationship with Audi by falsely stating that he had signed a written agreement with the company. D'Amato never received written permission from anyone (even individuals who did not have authorization to grant such permission). Consumers were likely to believe that his site was affiliated with Audi. It can be inferred that D'Amato intended to divert these customers from purchasing goods and services from Audi's legitimate website. Finally, with

respect to Factor IX, we find that the Audi mark — which was incorporated in the domain name www.audisport.com — is undoubtedly "distinctive and famous" within the meaning of ACPA.

Furthermore, D'Amato's actions are not excused under the "reasonable belief" exception in section 1125(d)(1)(B)(ii). He contends that "[e]very email from Devin Carlson and/or Melissa Grunnah offering content to Mr. D'Amato to post on *audisport.com* creates a signed agreement allowing usage of Audi-owned trademarks or trade dress." Appellant's Br. at 53. However, as a leading commentator on trademark law explains:

> [A] court should . . . make use of this "reasonable belief" defense very sparingly and only in the most unusual cases. That is, the court should place emphasis on the phrase "had *reasonable grounds* to believe" that the conduct was lawful, focusing primarily upon the objective reasonableness and credibility of the defendant's professed ignorance of the fact that its conduct was unlawful. Otherwise, every cybersquatter would solemnly aver that it was entitled to this defense because it believed that its conduct was lawful.

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS § 25.78 (4th ed. 2004). *See also Harrods Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 679 (E.D. Va. 2001)*, aff'd in part, rev'd in part on other grounds*, 302 F.3d 214 (4th Cir. 2002) ("All but the most blatant cybersquatters will be able to put forth at least some lawful motives for their behavior. To hold that all such individuals may qualify for the safe harbor would frustrate Congress' purpose by artificially limiting the statute's reach.").

As explained above, D'Amato did not have permission to use Audi's trademarks. He had no more than representations from individuals who lacked authority to give such permission, and his requests for written permission were never granted. Further, D'Amato unreasonably interpreted the language contained in press releases to grant him permission to use the trademarks. Following the Cease and Desist letters and this lawsuit, D'Amato continued to sell advertising space. Even construing facts and inferences in a light most favorable to D'Amato, his belief that he had permission to use the trademarks was objectively unreasonable, and therefore, D'Amato should not have the benefit of the reasonable belief defense. We affirm the district court's finding that D'Amato violated the AntiCybersquatting Consumer Protection Act.

## D. Injunctive Relief

When a district court grants a permanent injunction in a trademark case, we review factual findings under the clearly erroneous standard and legal conclusions under the *de novo* standard. The scope of injunctive relief is reviewed for abuse of discretion. *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 546 (6th Cir. 2005).

A plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted," and that it is in the public's interest to issue the injunction. *eBay Inc., et al. v. MercExchange, LLC*, 126 S.Ct. 1837, 1839 (2006). D'Amato's website used Audi's trademarks in its domain name and in the goods and services sold on it. If the district court did not grant an injunction, Audi would be irreparably harmed by consumers on D'Amato's site purchasing counterfeit items, instead of those that were lawfully sold by Audi. So long as www.audisport.com stayed online, there was potential for future harm, and therefore, there was no adequate remedy at law. It was in the public's interest to issue the injunction in order to prevent consumers from being misled. In balancing the hardships between each party, we note that D'Amato faces no hardship in refraining from willful trademark infringement, whereas Audi faces hardship from loss of sales. Thus, injunctive relief is warranted because D'Amato's

website did not fall under the category of protected speech; rather, it attempted to use Audi's good will to make a profit.

V

The district court awarded Audi attorneys' fees under 15 U.S.C. § 1117(a), which provides that courts may award reasonable attorneys' fees to the prevailing party in "exceptional" cases. Thus, section 1117(a) yields two inquiries: (1) whether Audi was a "prevailing party," and (2) whether this case was "exceptional." We review a district court's award of attorneys' fees for abuse of discretion, and will not overturn the district court's determination unless we have "a definite and firm conviction that the trial court committed a clear error of judgment." *Gnesys, Inc. v. Greene*, 437 F.3d 482, 488 (6th Cir. 2005) (citations omitted).

D'Amato claims that Audi is not a "prevailing party" on its Lanham Act claim because it did not recover any money damages, and thus is not entitled to attorneys' fees. In support of his argument, he relies on *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989), which held that when a plaintiff's success "can be characterized as purely technical or *de minimis*," a district court may conclude that it does not fit the definition of a "prevailing party." However, D'Amato cites no cases for his proposition that a plaintiff awarded injunctive relief in a trademark case is not a prevailing party. As the Ninth Circuit has noted, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988). We find that Audi's success in this case was not merely *de minimis*.

With respect to the second inquiry, although the statute does not define "exceptional," we have held that "a case is not exceptional unless 'the infringement was malicious, fraudulent, willful, or deliberate.'" *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004) (quoting *Hindu Incense v. Meadows*, 692 F.2d 1048, 1051 (6th Cir. 1982)). D'Amato did not limit his website to protected speech, such as news and information for Audi enthusiasts. Rather, he used counterfeit marks on his website and on the goods and services he attempted to sell for a profit. *See U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1192 (6th Cir. 1997) ("Where a counterfeit mark is used, an award of reasonable attorneys' fees is mandated, unless the court finds extenuating circumstances."). He knew that he needed permission to use such marks, evidenced by the fact he attempted to obtain consent from Volkswagen of America and individuals affiliated with Audi. Further, as explained above, the district court was correct in finding that under the AntiCybersquatting Consumer Protection Act, D'Amato acted in bad faith. A finding of bad faith under the ACPA does not necessarily compel a court to find "malicious, fraudulent, willful or deliberate" conduct. However, a court would be well within its discretion in determining that bad faith under the ACPA supports finding such conduct. *See People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001); *see also Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir. 1982) (noting that in the context of the Lanham Act, "bad faith can render cases 'exceptional' justifying an award of attorneys' fees").

D'Amato contends that he should not be required to pay attorneys' fees because he changed the website after the Cease and Desist letters and before Audi filed its complaint. However, even if we were to believe his contention that the website changed to non-commercial use before the complaint was filed,[4] this does not absolve D'Amato from liability. *See Shields v. Zuccarini*, 254 F.3d 476, 486-87 (3d Cir. 2001) (awarding attorneys' fees to the plaintiff, despite the fact that hours

---

[4] D'Amato's contention is actually false, because, as discussed above, he continued to sell advertising space on his site.

before he was served, the defendant changed his website's purpose from commercial to political). We hold that given D'Amato's bad faith use of counterfeit marks, the district court did not abuse its discretion in awarding attorneys' fees under section 1117(a).

VI

For the above reasons, we **AFFIRM** the judgment of the district court.