NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0726n.06

No. 20-1061

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 31, 2020
DEBORAH S. HUNT, Clerk

ALLSTATE INSURANCE COMPANY, )
INCORPORATED, )
)
    **Plaintiff-Appellant,** )
)
v. )
)
MICHAEL GERARD STACK; AMCO )
INSURANCE COMPANY; THOMAS )
MCINTYRE, Personal Representative of the )
Estate of Shannon McIntyre; SANDY )
HOLEWINSKI, Personal Representative of the )
Estate of Nicolas Pare, )
)
    **Defendant-Appellees.** )

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

OPINION

BEFORE: COOK, BUSH, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** In December 2017, Michael Stack ("Stack") veered across the median on Interstate 275 and began driving against traffic down the highway. He continued into oncoming traffic until he hit Shannon McIntyre's car head on, killing her and her passenger. Stack is now in prison for causing the accident, and the estates of the deceased driver and passenger have sued him for wrongful death.

Stack owned two insurance policies through Allstate at the time of the crash, a no-fault automobile policy and an umbrella policy. Allstate paid the estates the maximum available under the no-fault policy. But the company argues that Stack's umbrella policy doesn't cover the accident. That policy includes a business exclusion, and since the accident occurred between

Stack's home and his company's warehouse, Allstate claims that exclusion applies here. Because the umbrella policy's text does not support Allstate's position, we **AFFIRM**.

I.

*Michael Stack.* Professionally, Defendant Michael Stack was a part-owner of Penguin Toilets, LLC ("Penguin"). Privately, he struggled with alcoholism. Stack had been sober for 25 years before relapsing in January 2017. At that time, he checked himself into a 10-day inpatient clinic, after which he was sober again for a few months. But in the fall, Stack began drinking again, having ten or more drinks a day about three days a week.

Even so, Stack remained the Senior Vice President of Sales and Distribution for Penguin. He owned 6% of the company. On top of that, Penguin gave him a weekly "guaranteed" payment for about 20 hours of work. Although described as "guaranteed" for tax purposes, Stack stated that this payment required him to complete certain professional duties, which he would not have done for free. His brother, Patrick Stack, was the company's "managing member."

Stack's duties included representing Penguin at trade shows and coordinating the company's sales and distribution networks. More regularly, he made sales calls, delivered documents to the company's warehouse, and inspected inventory before it shipped. Stack maintained a home office and set his own hours. He did not have any office space at the warehouse. But he had to go there periodically to inspect inventory.

Stack did not have a company car, so he used his own to make these trips. Penguin did not reimburse Stack for mileage or maintenance. No decals or advertising on the car signaled its connection to Penguin. Stack and his wife bought the insurance policies themselves. The only arguable financial gain he received from driving to the warehouse was a possible tax write-off. (*See* R.42-6 at PID 798 (suggesting that he claimed his mileage on his taxes).)

*The Crash and Its Aftermath*. Either the night before or the morning of the accident, Stack printed purchase orders and bills of lading in his home office. For breakfast that morning, he ate a bagel and "took a slug of" vodka. The amount of vodka Stack drank is disputed, but he had at least one shot. (*Compare* R.42-6 at PID 789, 801 (Stack says he had a shot that morning and did not remember drinking during the drive), *with* R.44-6 at PID 940 (Trooper Lambert reports that Stack told him he had 3 to 4 shots before driving), *and* R.44-6 at PID 941 (Officer Baetens reports that Stack told her he had 3 to 4 shots before driving).) After breakfast, Stack put the documents in his car and headed to Penguin's warehouse to deliver them. The bottle of vodka came too.

Stack did not make or plan to make any stops; he took his normal route to work: "Pontiac Trail to M-5, M-5 to 275, 275 to Eureka, and Eureka to north on Commerce." (R.42-6 at PID 789.) On his drive, Stack spoke with Larry Rosenfeld, a Penguin sales representative based in New York.[1] Stack does not remember discussing business with Rosenfeld, but he says they may have. Visiting Penguin's warehouse was the only reason Stack ever drove to Taylor, Michigan. During his deposition, Stack said it was "possible" that he continued drinking during his drive.

Stack testified that, while he drove, he began to see flashes of light in both eyes. He ignored them at first, but the flashes worsened, and Stack decided he needed to get off the freeway. He planned to pull over until the flashes stopped. But he feared police might approach his idle vehicle. If they did, Stack would have to retrieve his insurance from the glove compartment, revealing the vodka. So Stack decided to throw the bottle into his backseat, where police might not see it when

---

[1] At a different point in his deposition, Stack states that he spoke to Rosenfield before leaving his home. Construing the facts in the light most favorable to Allstate, we assume Stack spoke to Rosenfield while driving.

3

he grabbed his insurance documents. Reaching for the glove compartment is the last thing Stack remembers before the crash.

While trying to hide the bottle, Stack crossed the median and began driving into oncoming traffic at 70 mph. Stack drove on the wrong side of the road for about one mile. That is, Stack's drive to work required him to go southbound on I-275, but he crossed the median and continued to drive *southbound* in the *northbound* lane. Eventually, he collided with Shannon McIntyre's car, killing her and her passenger, Nicholas Pare.

Dennis Turkette, a trucker, witnessed this crash through his side mirror. He says Stack drove into traffic for at least eight seconds without trying to change lanes, slow down, or re-enter the median. Turkette immediately called 9-1-1, alerting first responders to the crash. And that night he sent the video recording from his dashboard camera to law enforcement.[2]

In their depositions, both Michael and Patrick Stack stated that Michael's decisions to drink before driving and to drive on the wrong side of the freeway were not part of his responsibilities at Penguin. Michael Stack testified that driving into oncoming traffic was not a "business activity or function" related in any way to his duties at Penguin. (R.42-6 at PID 808.) He also implied that Patrick Stack would not have approved of his drinking before driving to work. For his part, Patrick testified that both his brother's driving against traffic and drinking before driving were "totally inconsistent" with his duties at Penguin. (*See* R.42-7 at PID 822, 824–25.)

---

[2] Local news obtained part of the footage, and readers can view it here: https://www.wxyz.com/news/dash-cam-video-shows-moment-before-deadly-wrong-way-crash-on-i-275. Mr. Turkette's voice is audible, and he authenticated the video during his deposition.

While investigating the crash, police found an open bottle of vodka in Stack's car. Michigan authorities charged Stack with two counts of Reckless Driving Causing Death, to which he pled "no contest." He received a five- to fifteen-year prison sentence.

Civil proceedings followed too. The estates brought wrongful death lawsuits against Stack in Wayne County Circuit Court. Stack and his then-wife held two insurance policies, both with Allstate. Allstate has paid out the limit of their no-fault automobile insurance policy: $500,000. So the relevant policy here is Stack's umbrella policy, which provides coverage up to $1 million. That policy contains a business exclusion, and Allstate argues that, because the crash occurred while Stack was driving to work, the policy does not cover it. The parties have agreed that the estates will receive the policy's limit if the exclusion does not apply.

*The Umbrella Policy.* Stack's umbrella policy limits coverage to "an occurrence arising only out of . . . [p]ersonal activities of an insured person." (R.42-3 at PID 748.) On the next page, under a heading reading "Losses We Do Not Cover," the policy included a business exclusion for "any occurrence arising out of a business or business property." (*Id.* at PID 749.) A "business" is:

> a) any full or part-time activity of any kind:
> > 1) arising out of or relating to an occupation, trade, or profession of an insured person; and
> > 2) engaged in by an insured person for economic gain.

(*Id.* at PID 744.) And so, after incorporating the relevant cross-references, the business exclusion denies coverage:

> to any [accident resulting in bodily injury] arising out of any act or failure to act by any person in performing functions of that person's [full or part-time activity of any kind arising out of or relating to an {insured person's} occupation, trade or profession and engaged in by an insured person for economic gain].

(*Id.* at PID 744, 749.)

*Proceedings Below*. Allstate's only claim is for a declaratory judgment determining that the umbrella policy does not cover Stack's crash. If granted, the declaratory judgment would confirm Allstate's position that it has no duty under the umbrella policy to pay damages levied against Michael Stack or to defend him in court.

Allstate filed its Complaint against Michael Stack, the estate of Shannon McIntyre, the estate of Nicholas Pare, and AMCO Insurance[3] in September 2018. Defendants filed Answers, but not motions to dismiss. The parties completed discovery, and cross motions for summary judgment followed. The district court granted summary judgment to the estates. Allstate timely appealed.

The district court reasoned that Michael Stack's crash, which occurred during his commute, did not "aris[e] out of" his "occupation, trade, or profession," because Stack's uncompensated commute was not a business activity. The district court also suggested that the crash did not meet the causal standard required by Michigan law. Because of these facts, the district court held that the crash was "only incidentally related" to Stack's business, so Allstate's umbrella policy covered it.

The only issue on appeal is whether the district court properly interpreted the umbrella policy's business exclusion.

II.

A.

We review a district court's grant of summary judgment de novo. *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006). When, as here, both sides move for summary judgment, the

---

[3] AMCO provided business insurance to Penguin. In its summary judgment order, the district court dismissed AMCO from the case as not properly before the court.

district court need not award summary judgment to either side. *Craig v. Bridges Bros. Trucking, LLC*, 823 F.3d 382, 387 (6th Cir. 2016). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (citation omitted).

We review the entire evidentiary record for a genuine issue of material fact. *D'Amato*, 469 F.3d at 542. If a genuine issue of material fact exists, we must reverse the grant of summary judgment. *Id.* We consider the evidence in the light most favorable to the nonmoving party. *Id.*

Here, the district court denied Allstate's summary judgment motion and granted the estates' summary judgment motion. So we must consider the evidence in the light most favorable to Allstate.

B.

Because this is a diversity case, we apply the substantive law of Michigan, the forum state. *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000) (citing *Erie R.R. Co. v. Thompkins*, 304 U.S. 64 (1938)). When sitting in diversity, we apply decisions of the Michigan Supreme Court, if it has addressed the relevant issue. *See id.* If the Michigan Supreme Court has not addressed the relevant issue, we anticipate how it would resolve the issue and apply that rule. *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005). Intermediate state-court decisions are persuasive, unless there is evidence that the state's highest court would decide the issue differently. *See id.* (citing *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)).

Michigan courts review contract interpretation de novo. *Morley v. Auto. Club of Mich.*, 581 N.W.2d 237, 240 (Mich. 1998). An insurance contract's terms "should be construed in the plain, ordinary and popular sense of the language used, as understood by the ordinary person."

*Bianchi v. Auto. Club of Mich.*, 467 N.W.2d 17, 20 n.1 (Mich. 1991) (citations omitted). "As a general rule, where terms having a definite legal meaning are used in a written contract, the parties to the contract are presumed to have intended such terms to have their proper legal meaning, absent a contrary intention appearing in the instrument." *In re Est. of Moukalled*, 714 N.W.2d 400, 408 (Mich. Ct. App. 2006) (citing three earlier Michigan cases for the same proposition).

Michigan courts apply a two-step inquiry to insurance coverage disputes. *Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 841 (Mich. 1997). First, the court determines whether the insurance agreement covers the accident. *Id.* Second, the court reviews exclusions and determines whether any negates coverage. *Id.* Courts interpret ambiguous policies in favor of the insured. *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 787 (Mich. 2003) (citation omitted).

III.

A.

Everyone agrees that the umbrella policy covers the accident. The dispute here is over whether its business exclusion applies.

The parties' arguments are straightforward. Allstate argues that Stack's drive to work "aris[es] out of" his "occupation, trade, or profession." He needed to go to the warehouse to inspect inventory to get paid. Indeed, he didn't drive to Taylor for any reason other than to do work for Penguin; those trips were "only business related." (Appellant's Br. at 20.) So, Allstate contends, the crash arose out of Stack's business, and the business exclusion denies coverage.

The estates disagree. They argue that Stack's driving does not meet the terms of the business exclusion because Penguin did not pay him for it. And even if the business exclusion would have applied to Stack's typical commute, his driving on the wrong side of the freeway was so far removed from his work responsibilities that the business exclusion does not reach it.

8

B.

The business exclusion in Michael Stack's umbrella policy applies to "[a]ny full or part-time activity of any kind: 1) [a]rising out of or relating to an occupation, trade, or profession of an insured person; and 2) [e]ngaged in by an insured person *for economic gain . . . .*" (R.42-3 at PID 744 (emphasis added).) Stack's driving must meet both these conditions for Allstate to prevail.

And the fatal commute does not meet this second condition. The critical language here is the last quoted clause: "for economic gain."[4] Michael Stack received a "guaranteed payment" from Penguin for representing the company at trade shows, making sales calls, inspecting inventory, and managing shipping documents. But the company did not pay for Stack's driving to any of these places, including to the company's warehouse to perform the latter two responsibilities. He did not receive a car allowance. He owned the car himself. Penguin didn't reimburse Stack for gas, mileage, or insurance, or dictate when or how often he should be at the warehouse. So Stack's travel to and from Penguin's warehouse was not "for economic gain." Only the tasks he did there were.[5]

Even if Stack wrote off the mileage on his tax returns, as he suggested during his deposition, that would not be enough. Something done "for" economic gain has "the aim or

---

[4] We acknowledge that the Michigan Court of Appeals has a "well-established" test for resolving business exclusion cases. *State Farm Fire & Cas. Co. v. Gates*, No. 218886, 2000 WL 33415963, at *1, *2 (Mich. Ct. App. July 28, 2000) (citing *State Mut. Cyclone Ins. Co. v. Abbott*, 216 N.W.2d 606 (Mich. Ct. App. 1974)). But the Michigan Supreme Court itself has never adopted this test, continuing instead to decide business exclusion cases by examining the exclusion's text. *See, e.g.*, *Hunt v. Drielick*, 852 N.W.2d 562, 566–69 (Mich. 2014). So our analysis will do the same.

[5] Our holding here agrees with the general rule that business exclusions do not apply to uncompensated point-to-point travel. *See* 8A Steven Plitt et al., COUCH ON INSURANCE § 120:32 (Rev. 3d. ed. 2020) (collecting cases). Courts seem to enforce an exception to this rule where the vehicle is owned or leased by the driver's employer. *See id.* § 120:31 (same). Because Stack owned the car, this exception does not apply here.

purpose of" economic gain. *For*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2020). Stack's driving got him to the warehouse. Once he was there, then he could do the tasks Penguin paid him to complete – managing the shipments and inspecting the inventory. It would be odd if the optional, after-the-fact decision to claim a tax break retroactively made the original commuting an activity done "for economic gain." Taking a write-off realizes an economic gain, but the underlying driving does not.

And the "for economic gain" language is not Allstate's only problem. The business exclusion can only reach an "activity" that is "full or part-time." This language invokes the ordinary understanding of full-time and part-time work. Nobody commutes "full or part-time." Rather, people commute to their "full or part-time" jobs. So the umbrella policy's business exclusion does not reach commuting. *See In re Smith Tr.*, 745 N.W.2d 754, 758 (Mich. 2008) (the "plain and ordinary meaning" of contract terms guides the court's interpretation of a contract).

In sum, Stack's commuting is not a "full or part-time activity." And he did not do it "for economic gain." So Allstate's business exclusion did not capture it. The umbrella policy's plain language covers Stack's crash.

### C.

Even if the policy's plain language supported Allstate's position,[6] there would still be an insufficient causal connection between Stack's work and the accident. Consider the business exclusion again:

> [coverage] will not apply to any [accident resulting in bodily injury] <u>arising out of</u> any act or failure to act by any person in performing functions of that person's [full or part-time activity of any kind <u>arising out of or relating to</u> an {insured person's}

---

[6] Although we determined above that Stack's commuting was not a "full or part-time activity" that the business exception could exclude from coverage, for this analysis, we assume it is. Otherwise, there is no qualifying conduct for the decedent's injuries to "arise out of."

occupation, trade or profession and engaged in by an insured person for economic gain].

(R.42-3 at PID 744, 749) (emphasis added). Twice, this exclusion incorporates the "arising out of" causation standard, which the Michigan Supreme Court has defined in *Pacific Employers* and *Thornton*. At bottom, those insurance cases hold that injuries "arise out of" something else where the "causal connection is more than incidental, fortuitous or but for. The injury must be foreseeably identifiable . . . ." *Pac. Emps. Ins. Co. v. Mich. Mut. Ins. Co.*, 549 N.W.2d 872, 875 (Mich. 1996) (citation omitted) (adopting this language as the "standard of causation" in an insurance case); *see also Thornton v. Allstate Ins. Co.*, 391 N.W.2d 320, 323, 326–28 (Mich. 1986) (interpreting this causal language in Michigan's no-fault insurance statute).[7]

Under *Pacific Employers* and *Thornton*, the "arising out of" standard has broad, but not unlimited, application. In *Pacific Employers*, a school bus driver dropped a kindergarten student off at the wrong bus stop after her first day of school. 549 N.W.2d at 874. While looking for her babysitter's house, the 5-year-old tried to cross a busy street. *Id.* She was hit by a car and permanently disabled. *Id.*

That policy covered "bodily injury" "*arising out of the . . . use*" of the bus. *Id.* Among other arguments, the school's primary insurance carrier claimed the bus drivers' "separate and personal negligence" caused the injury, not the use of the bus. *Id.* at 877. The court, in rejecting that argument, reasoned that even if the bus driver had been negligent, the girl's injuries still arose

---

[7] The parties point us to *People v. Johnson*, 712 N.W.2d 703 (Mich. 2006), for the appropriate interpretation of "arising out of." *Id.* at 706 ("[s]omething that 'aris[es] out of,' or springs from or results from something else, has a connective relationship, a cause and effect relationship, of more than an incidental sort with the event out of which it has arisen."). While this is the Michigan Supreme Court's most recent interpretation of that causal language, *Johnson* is a criminal sentencing case. Without more guidance, we think the Michigan Supreme Court's discussion of the "arising out of" standard in its insurance cases is most persuasive.

from the driver's use of the bus, as would injuries "caused by the school bus crossing a double yellow line or going through a red light." *Id.* But the court was careful to not "imply that all negligent acts of a school bus driver necessarily involve the 'use' of a school bus." *Id.* at 877 n.12. "Situations can be imagined in which a driver's negligence is so disconnected with the use of the school bus that the injuries suffered could not properly be said to be within the language of the [insurance] policy considered in this case." *Id.* The court ultimately held "that an injury that is foreseeably identifiable with the disembarkation at a place other than the predetermined location, *arises out of* the 'use' of the school bus." *Id.* at 874 (emphasis added).

*Thornton* shows the standard's limits. Eddie Thornton was a taxi driver. *Thornton*, 391 N.W.2d at 321. At about 2:40 a.m., Thornton received a call from a potential rider and went to meet him. *Id.* After locating the rider, and asking him for the destination, Thornton pulled away from the curb. *Id.* The rider shot him. *Id.* In the ensuing struggle, the robber took Thornton's clothes and $15. *Id.* Thornton became paralyzed from the neck down. *Id.*

To pay for the injuries, Thornton and his business partner sought a declaratory judgment stating that their insurance plan covered the mugging because it "arose out of" his use of the taxi. *Id.* at 321–22. The court analyzed the insurance policy under Michigan law, which makes insurers "liable to pay benefits for accidental bodily injury *arising out of* the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle." *Id.* at 322 (emphasis added) (citation omitted). Ultimately, the Michigan Supreme Court held that "[t]he connection in this case between the debilitating injuries suffered by Mr. Thornton and the use of the taxicab as a motor vehicle is no more than incidental, fortuitous, or 'but for.'" *Id.* at 327. His injuries did not "arise out of" his "operation . . . of a motor vehicle as a motor vehicle." *Id.* at 328.

When contracting parties use words with a defined legal meaning, courts assume they intended that meaning to apply. *In re Est. of Moukalled*, 714 N.W.2d at 408. So to resolve this case, we must determine whether the accident "aros[e] out of" Michael Stack's drive to Penguin's warehouse.[8] Under *Pacific Employers* and *Thornton*, the accident did so if it was "foreseeably identifiable with the normal [business activity]" and if the connection between the decedents' injuries and Michael Stack's commute is "more than incidental, fortuitous[,] or but for." *Pac. Emps.*, 549 N.W.2d at 875 (citation omitted).

Although we can easily imagine a car crash that is "foreseeably identifiable" with a commute, Stack's accident is not. To be sure, the Michigan Supreme Court has said that injuries "caused by . . . crossing a double yellow line or going through a red light" would "arise out of" the use of a motor vehicle. *Pac. Emps.*, 549 N.W.2d at 877. But the court was equally clear that, at some point, a driver's "negligent acts" sever this connection: "Situations can be imagined in which a driver's negligence is so disconnected [from business activity] that the injuries suffered could not properly be said to be within the [insurance policy's causal] language." *Id.* at 877 n.12. And Stack's actions are precisely the kind of egregious conduct that the Michigan Supreme Court determined could break a causal connection, even where a mine-run traffic violation could not.

Stack drank before he got behind the wheel. (*See* R.42-6 at PID 807; R.42-7 at PID 822, 824–25.) And in his deposition, Stack admitted that he might have even continued to drink *while* he was driving. (R.42-6 at PID 806.) We don't know of any profession where the employees are required, encouraged, or even permitted to drink before driving to work.

---

[8] We assume Michael Stack's driving "ar[ose] out of or relat[ed] to" his "occupation."

13

But put the drinking aside. Stack's other actions before the accident were unrelated to his commute. Before his car appeared on Turkette's dashboard camera, Stack managed to drive across a large median. After that, he continued into oncoming traffic at a constant speed for about a mile, even maintaining his lane around a bend. Nothing about the crash suggests that Stack was heading to work. So the decedents' injuries were caused by "negligence" "disconnected" from Stack's commute, not the commute itself. *See Pac. Emps.*, 549 N.W.2d at 877 n.12.

The only "causal connection" Stack's commute had to this accident was "incidental, fortuitous[,] or but for." *Pac. Emps.*, 594 N.W.2d at 875. But for his decision to drive to Penguin's warehouse, the accident would never have happened. That the accident occurred during Stack's commute is only incidental and fortuitous given his sustained, vodka-fueled driving on the wrong side of the interstate into oncoming traffic. "The [commute] here was merely the situs of the [crash]—the injury could have occurred whether or not [Stack had been commuting.]" *See Thornton*, 391 N.W.2d at 327.

The decedents' injuries did not "arise out of" Stack's commute because they lacked the necessary causal connection.

IV.

Because the umbrella policy's plain language and the causal standard both make clear that the business exclusion does not apply, we **AFFIRM**.